*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0320p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

STEPHEN M. BELL,

>    *Petitioner-Appellant,*

>    *v.*                                                    No. 04-5523

RICKY BELL, Warden,

>    *Respondent-Appellee.*

————————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 95-00600—William J. Haynes, Jr., District Judge.

Argued: February 2, 2006

Decided and Filed: August 25, 2006

Before: COLE, CLAY, and GIBBONS, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Gretchen L. Swift, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Gretchen L. Swift, Jude T. Lenahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Michelle C. McIntire, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

CLAY, J., delivered the opinion of the court, in which COLE, J., joined. GIBBONS, J. (pp. 23-26), delivered a separate opinion concurring in part and dissenting in part.

————————————

## OPINION

————————————

CLAY, Circuit Judge. Petitioner Stephen M. Bell appeals the March 26, 2004 order of the United States District Court for the Middle District of Tennessee granting summary judgment in favor of Respondent Ricky Bell, Warden, and dismissing Petitioner's habeas petition filed pursuant to 28 U.S.C. § 2254. For the reasons set forth below, we **REVERSE** the district court order and **GRANT** the petition for writ of habeas corpus.

1

# I. BACKGROUND

## A.    PROCEDURAL HISTORY

On March 5, 1987, a Tennessee state jury found Petitioner guilty of one count of murder in the first degree and one count of murder in the second degree.  On March 17, 1987, the state trial court sentenced Petitioner to a life sentence and a twenty-year sentence for the respective crimes, with the sentences to run consecutively.  On August 3, 1989, the state court of appeals affirmed the convictions.  *State v. Bell*, C.C.A. No. 88-138-II, 1989 WL 86583 (Tenn. Crim. App. Aug. 4, 1989) (unpublished opinion).  The Tennessee Supreme Court denied permission to appeal.

On March 29, 1990, Petitioner filed a petition for state post-conviction relief.  On November 2, 1992, the state trial court denied relief.  On August 4, 1994, the state appellate court affirmed the denial of relief.  *Bell v. State*, No. 01C01-9304-CR-00130, 1994 WL 406168 (Tenn. Crim. App. Aug. 4, 1994) (unpublished opinion).  The Tennessee Supreme Court denied permission to appeal.

On June 12, 1995, Petitioner filed a petition in the United States District Court for the Eastern District of Tennessee for habeas relief pursuant to 28 U.S.C. § 2254.  His petition was subsequently transferred to the United States District Court for the Middle District of Tennessee.  On October 23, 1998, the district court dismissed the petition without prejudice for inactivity.  On March 19, 1999, Petitioner filed a motion to reopen the case or, alternatively, a motion to set aside the court's order of dismissal, and a renewed motion for appointment of counsel.  The district court granted the motion to reopen the case but denied the motion for appointment of counsel.  On December 3, 1999, Respondent filed a motion to dismiss or, alternatively, a motion for summary judgment.

On January 24, 2000, Petitioner's case was transferred to Judge Haynes.  The district court appointed a federal public defender as Petitioner's counsel and permitted Petitioner to file an amended complaint.  On September 6, 2000, Petitioner filed an amended complaint.  On September 22, 2000, Respondent filed a supplement to his previous motion to dismiss or, alternatively, a motion for summary judgment.

On April 26, 2002, the district court granted summary judgment against Petitioner for all but five of his claims: (1) insufficiency of the evidence; (2) ineffective assistance of trial and appellate counsel; (3) *Brady* violation; (4) failure to allow trial counsel to withdraw because of a conflict of interest; and (5) improper restriction of questioning of jurors during *voir dire*.  The district court granted an evidentiary hearing with respect to the claims of ineffective assistance of trial and appellate counsel and the *Brady* violation.

On March 25, 2004, the district court denied the habeas petition.  The court found that the claims of insufficiency of the evidence and improper *voir dire* were not supported by evidence sufficient to overcome the presumption of correctness afforded to the state court's findings of fact.[1]  As to the *Brady* claim, the court found that Petitioner had not shown "a reasonable probability of acquittal to justify the writ."  (J.A. at 581.)  As to the ineffective assistance of counsel claim, the court found that Petitioner had  insisted on an identity defense at trial, so that he could not fault his counsel for not pursuing an intoxication or mental illness defense.

Petitioner timely filed a notice of appeal.  The district court granted a certificate of appealability as to the *Brady* claim and the claim of ineffective assistance of counsel based on trial

---

[1]For reasons unclear from the record, the district court never addressed the claim of failure to allow trial counsel to withdraw because of a conflict of interest.  Petitioner, however, does not raise this argument here on appeal.

counsel's failure to present a complete defense and to investigate all avenues of defense. This Court declined to expand the certificate of appealability and limited the appeal to the preceding two issues.

**B.     FACTS**

The following facts were found by the state appellate court on direct review:

The victims, Herman Harrison Wallace, a/k/a Mad Dog, and his wife, Jean Lynn Wallace, were street people who camped under the bridges along the Cumberland River. The defendant, Michael Bell, a/k/a Monk, a street person, camped between the Wallaces and Nashville's Riverfront Park.

Ronald Harrington, a street person, met the defendant on the railroad tracks near the camp sites on September 6, at approximately 3:00 p.m. Defendant was shirtless, wearing Levi's, a pair of shoes or boots and had a gun in his hand. Chained to his belt, was a billfold similar to that carried by truck drivers. The gun was either a .32 or .38 caliber revolver. Defendant appeared to be under the influence and stated that he had been "coking". [sic] During this exchange the defendant asked Mr. and Mrs. Harrington to take care of his dog if anything happened to him.

Edward Stansbury, an admitted alcoholic, testified that he spent the night of September 5, 1986, with friends on the river. The next morning he left but returned to the camp of Gary Hedges in the afternoon. At approximately 4:30 p.m. they noticed a man come up a path with a shiny black dog on a leash. The leash was a choker chain with a leather belt. When the man got to within twenty feet he spoke identifying himself as "Monk" and inquiring if "Mad Dog" and Jean were home. He walked down to the Wallaces' tent and entered. Up to this point he, Stansbury, had no reason to commit to memory the man's clothing or facial features.

As Stansbury and Hedges continued to sit they heard the sounds of dogs fighting and people arguing in the Wallaces' camp, then they heard a muffled shot. Jean Wallace ran out of the tent screaming "He has killed my dog, he has killed my dog". [sic] She turned and re-entered the tent. Stansbury heard a distinctive gun shot and saw Jean Wallace backing out of the tent. As she cleared the entrance she fell and there were two more shots. He was sure he had seen the man fire the last shot. The man had been right behind Mrs. Wallace at the entrance. The man left the tent and left the scene. As the man was leaving he attempted to reload his pistol.

Stansbury described the culprit as 6'2" or 6'1", lanky, wearing fairly new blue jeans, a black baseball cap over his eyes, a sleeveless Levi jacket and T-shirt. His arms were tattooed. He had a billfold with a chain which appeared attached to a belt loop.

At a line-up conducted near the crime scene in the fading evening light, Stansbury was hesitant to identify the man in the number two spot. He was certain as to the man's jeans and nearby dog. While testifying he said he was still confused about the man's beard; he thought the culprit had short dark hair, but everything else about the number two man, the defendant, "fit to a tee". [sic]

Robert Moore, a Metropolitan Police Department homicide officer, arrived at the Wallaces' camp. He viewed the body of Mrs. Wallace and was directed to four shell casings that were lying on the ground. The soil in the area was fairly loose and the shell casings, covered with a chalky gray substance, were on top of the soil. Upon closer examination he was able to detect the smell of gun powder.

Officer Moore was advised that Mr. Wallace had been moved to General Hospital and although he appeared to have been shot as many as three times, only one slug had been found at the hospital. The officers at the crime scene made an extensive search and were able to recover a slug from the bloody mattress within the tent where Mr. Wallace had lain when shot.

After talking with Hedges and Stansbury and getting a general description of the suspect, the officers broadcasted a pick-up. Other detectives took the defendant in custody and returned him to an area near the crime scene. Due to the fading light in and around the camp sites and under the bridges, other officers were setting up a line-up of street type people in an open area nearby. Officer Moore explained that facial identification was not that strong at the crime scene, but clothing details and the overall characteristics of the participants were strong in the witnesses' minds.

Officer Mark Wynn and two other officers responded to a call that a man fitting the description of the suspect was believed to be in the area of Fessler's Lane and Hermitage Avenue. They observed the suspect sitting on the curb and drinking a beer. He had a dog with him. He was taken in custody and found to have six unspent .38 caliber Special Winchester 158 grain bullets in his pants pockets, but no weapon was found. He was concerned about the dog so the officers agreed to transport the dog to the place of the line-up. (A picture of the dog wearing the choke chain and belt leash was shown the jury.)

Sergeant Tommy Jacobs testified that shortly after 5:30 p.m., September 6, 1986, he visited the camp site of the defendant and recovered eleven spent .38 caliber shell casings and a Winchester ammunition box that were lying on the ground. A holster was also recovered at the camp site. Later at the police station Sergeant Jacobs read the defendant his Miranda rights. When told he would be charged with murder, the defendant responded that he had not shot anyone, had not shot a gun and had never shot a gun.

Officer Darryl Ryan performed a nitric acid test on the defendant's hands. The swabs were sent to the crime laboratory.

Officer Archie Spain was sent to General Hospital. He took possession of a .38 caliber slug that was laying beside Mr. Wallace's body in the emergency room.

The State introduced testimony from three laboratory technicians. The first technician had examined the defendant's clothing for blood stains but found none. The second technician, a criminalist, had examined the swabs from the defendant's hands for gunshot residue. This technician testified that "antimonium, barium and lead indicative of gunshot residue was found in significant concentrations on exhibit 5, hand swabs. These results indicate that the subject could have fired or handled a gun."

The third technician was a firearm examiner. He identified the two lead slugs filed earlier as exhibits as being fired from the same firearm. He had disassembled one of the live cartridges taken from the defendant's pockets to compare the lead to the other lead slugs. He was of the opinion the three were from the same manufacturer. The eleven spent shells taken from defendant's camp site were compared with the four spent shells recovered at the victims' camp site. Based upon his microscopic examination he was of the opinion they all had been fired from the same firearm.

The medical examiner testified in detail as to two gunshot wounds found upon Jean Wallace's body. In his opinion either one of these would have caused her death. From his examination of Herman Wallace, he concluded that death was the result of a saddle pulmonary embolus, a blood clot caused by the gunshot wounds which occluded the artery to the lungs.

The State rested its case in chief. Defendant's motion for judgments of acquittal were overruled.

Defendant testified that on the morning of September 6, 1986, he went to Riverfront Park. There he met two men with whom he pooled his money for the purchase of a fifth of wine. He and one of the men moved about in that general area of town during which time the man mentioned having a .38 caliber pistol but needed shells. They went to Service Merchandise where this person purchased a box of cartridges upon signing the log and entering an identification number. They returned to Riverfront Park and then to defendant's camp site where defendant did target practice with the man's pistol. At noon he went to lunch and returned to the camp. The men were still at his camp. Later defendant walked to Lebanon Road and Fessler's Lane where he was arrested.

He acknowledged being brought back to the Riverfront Park. He testified that he did not know he was in a line-up. When shown a picture of the line-up he identified one participant as the man who purchased the shells that morning.

Defendant explained that his statement to Sergeant Jacobs of having never fired a gun had reference to a gun used to murder someone. He was unable to explain why he had first said his dog had been with him all day and changed to say the dog was not with him all day. He denied shooting the Wallaces.

The State called Billy Joe Camden as a rebuttal witness. This was the man who had purchased the box of shells at Service Merchandise on lower Broadway. Camden made the purchase at the request of the defendant. While they were together the defendant did not have his dog with him. After the purchase of the ammunition they went their separate ways. He did not go to the defendant's camp site nor witness him fire a gun. He was taken from Riverfront Park for the line-up. Camden testified that he owned a .22 caliber rifle but never owned a .38 caliber pistol.

Following argument of the attorneys and instructions from the court, the jury retired and deliberated. The jury returned to the courtroom and delivered the verdicts [of guilty of first-degree murder and guilty of second-degree murder].

*State v. Bell*, 1989 WL 86583, at *1-4.

The following facts were presented at the evidentiary hearing conducted by the district court:

Dr. Pamela Auble ("Auble"), an expert witness for Petitioner, testified that she conducted a neuropsychological evaluation of Petitioner on November 21, 2001. She reviewed numerous records indicating that Petitioner suffered a history of alcoholism and depression. In her interview with Petitioner, Petitioner stated that he had been drinking heavily for the month prior to the date of the murders, and he had also been drinking heavily on the day of the murders. He stated that he could not remember certain periods of time on the day of the murder. Auble concluded that Petitioner was significantly intoxicated on the day the shootings occurred. She opined that if Petitioner committed the shootings, he did so under significant inebriation and severe depression.

Auble was of the belief that Petitioner would have been unable to form a premeditated and deliberate plan to kill the victims.

Next, Ross Alderman ("Alderman"), Petitioner's trial counsel, testified. Alderman testified that he had requested an initial mental health evaluation of Petitioner early on in his representation. The reason for this request was that Petitioner admitted to a lengthy history of substance abuse and that Petitioner did not recall any events on the day of the murders because of blackouts. Alderman stated that he had made an initial investigation into Petitioner's history of alcohol abuse. Alderman testified that he believed that an intoxication defense was the most effective defense for Petitioner; however, Petitioner insisted on an identity defense, *i.e.*, he was not the shooter. On cross-examination, Alderman testified that a defense of identity and a defense of intoxication would have been inconsistent.

Alderman testified that William Davenport ("Davenport") was a key witness for the prosecution. Davenport testified at trial that he had a conversation with Petitioner while the two men were in custody where Petitioner admitted to shooting the victims. Also, Davenport testified that Petitioner admitted to shooting Mrs. Wallace because she was a witness to the shooting of Mr. Wallace. Alderman stated that the testimony was damaging in two ways: first, it negated the defense of identity; second, it provided a basis for premeditation with respect to the shooting of Mrs. Wallace.

Alderman testified that he requested any potentially exculpatory or impeachment evidence from the prosecution, and that the prosecution did not produce any such evidence. Alderman stated that he was aware that Davenport was in custody at the time directly preceding Petitioner's trial, but he did not know that the government had *nolle prosequied*[2] two counts of grand larceny and two counts of concealing stolen property against Davenport after Davenport contacted the prosecution concerning his conversation with Petitioner. Alderman testified that he was unaware that Davenport had received concurrent sentences for two convictions of concealing stolen property after Davenport contacted the prosecution concerning his conversation with Petitioner. Alderman testified that he was also unaware that the prosecution was going to write a letter to the parole board on behalf of Davenport after Petitioner's trial terminated. Alderman testified that he was also unaware that Davenport had originally contacted the prosecution to testify against Petitioner for a transfer of facilities or a work release program. On cross-examination, Alderman admitted that he knew that Davenport had an upcoming parole hearing, and that Alderman had argued this point to the jury as impeachment of Davenport.

Ross Miller ("Miller"), the prosecutor at Petitioner's trial, also testified at the evidentiary hearing. Miller testified that he did not promise Davenport anything in exchange for Davenport's testimony at Petitioner's trial. Miller testified that while he wrote a letter to the parole board on Davenport's behalf, he did not promise Davenport that he would do so. Miller admitted that Davenport first approached the prosecution about testifying against Petitioner, and that "[e]verybody wants something, and I'm sure Davenport wanted something." (J.A. at 476.) Notes taken by Miller at the first meeting between Miller and Davenport indicated that Davenport wanted a transfer of facilities or a work release program.

During closing arguments, Miller argued to the jury that he did not have any "say-so" with the parole board in Davenport's case. At the evidentiary hearing, Miller admitted that he did in fact write a letter to Davenport's parole board; in that letter Miller wrote that the prosecution did not have a strong case without Davenport's testimony. Davenport's testimony was important in that it

---

[2]In other words, the government withdrew its prosecution of these charges. *See* Black's Law Dictionary 1070 (7th ed. 1999).

provided Petitioner's motive for the shooting and established what had actually happened at the shooting.  Miller admitted that Davenport was the prosecution's final witness in its case.  Miller reiterated that he made no promises to Davenport.

## II.  DISCUSSION

**A.    THE DISTRICT COURT ERRED IN DENYING RELIEF ON PETITIONER'S CLAIM THAT THE PROSECUTION WITHHELD MATERIAL IMPEACHMENT INFORMATION REGARDING WITNESS WILLIAM DAVENPORT, IN VIOLATION OF *BRADY v. MARYLAND*, 373 U.S. 83 (1963).**

### 1.    Preservation of the Issue

Respondent contends that Petitioner's *Brady* claim is procedurally defaulted, as Petitioner did not present the *Brady* claim to any state court.  While we agree that this claim is procedurally defaulted, we conclude that Petitioner has demonstrated adequate cause and prejudice to overcome that default.

The general rule in the § 2254 context is that if Petitioner's claim is procedurally defaulted in the state courts, the federal courts may not consider that claim on habeas review unless Petitioner demonstrates cause and prejudice.  *Wainwright v. Sykes*, 433 U.S. 72, 86-90 (1977).  This Court generally employs a four-part test in deciding whether a claim is barred from federal habeas review because of state procedural default:

> First, the court must ascertain whether there is an applicable state procedural rule. Second, the court must determine whether the state courts actually enforce the rule. Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.  Finally . . ., if the criminal defendant did not comply with the rule, the defendant must demonstrate there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error.

*Jamison v. Collins*, 291 F.3d 380, 385-86 (6th Cir. 2002).  The Supreme Court, however, has outlined an alternate inquiry when a party fails to exhaust his state remedies with respect to a claim:

> [I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirements would now find the claims procedurally barred[,]. . . there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).  Petitioner failed to exhaust his state court remedies, as he did not present his *Brady* claim to the state courts.  As the district court correctly noted, this claim would now be barred by the state courts, as Tennessee statutory law establishes a one-year statute of limitations as to the filing of state post-conviction petitions and limits a petitioner to only one petition for post-conviction relief.  Tenn. Code Ann. § 40-30-102.  Petitioner's *Brady* claim is thus procedurally defaulted; the question remains as to whether Petitioner has demonstrated cause and prejudice to overcome this default.

The Supreme Court has specifically held that a petitioner shows cause for his failure to raise a *Brady* claim in state court "when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  Generally speaking, "when the factual basis of the claim was 'reasonably unknown'

to the defendant's counsel," the defendant shows cause for failure to raise the claim during state proceedings. *Jamison*, 291 F.3d at 388 (internal citation omitted). A *Brady* claim may be reasonably unknown to a defendant, as the claim is based entirely on the fact that the prosecution withheld exculpatory evidence from the defendant. As this Court viewed the situation, "[s]uppression of exculpatory or favorable impeaching evidence by the state that results in an inability to raise claims relating to that evidence in state court establishes cause for the ensuing default." *Hutchinson v. Bell*, 303 F.3d 720, 741 (6th Cir. 2002).

In the instant case, Petitioner's counsel requested any exculpatory or impeachment evidence that the prosecution had in its possession, and the prosecution provided nothing. The prosecution did not inform Petitioner that Davenport had approached the prosecution to testify in exchange for a building transfer or a work release program; the prosecution did not reveal that shortly after a meeting with Davenport, the government dropped four criminal counts against Davenport and Davenport received concurrent sentences for two additional criminal counts; and the prosecution made no mention of any intention to aid Davenport in his upcoming parole hearing. Petitioner thus could not have made his *Brady* claim in state court because he had no way of knowing that the prosecution failed to disclose such evidence. Moreover, once the prosecution responded to Petitioner's request for exculpatory evidence with an empty hand, Petitioner was under no duty to engage in further investigation to determine whether the prosecution in fact withheld evidence. *See Banks*, 540 U.S. at 695 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."). Petitioner's valid explanation for not raising the *Brady* claim in the state court proceedings is that he was unaware that the prosecution had withheld *Brady* material, and that he was justified in his reliance on the prosecution's representation that it had not withheld *Brady* material.

To deny cause in this case would be to allow the prosecution to doubly benefit from its actions: the prosecution could ignore its constitutional duty to provide exculpatory evidence, and it could evade review for its behavior by asserting state procedural default. The jurisprudence of both the Supreme Court and this Court rejects this result and leads to the conclusion that Petitioner has shown cause for his failure to raise his *Brady* claim before the state courts.

In order to demonstrate prejudice with respect to a *Brady* claim, Petitioner must prove that the evidence suppressed by the prosecution was material so as to establish a *Brady* violation. *Banks*, 540 U.S. at 691. As explained, *infra*, the prosecution failed to disclose material impeachment evidence of Davenport, and this failure resulted in a *Brady* violation. Thus, Petitioner has satisfied the prejudice prong.

### 2.      Standard of Review

When a district court denies a habeas petition, this Court reviews its legal conclusions *de novo* and its factual conclusions for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

Because Petitioner filed his habeas petition prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, the pre-AEDPA standard of review applies with respect to the conclusions of the state courts.[3] Under this standard, the Court

---

[3]Respondent argues that AEDPA applies to the instant case; Respondent's logic is that while Petitioner filed his original petition before the enactment of AEDPA, this original petition was dismissed by the district court and erased out of existence. As a result, when Petitioner filed his amended petition, there was nothing to amend, so that his amended petition was actually a re-filing that occurred after the enactment of AEDPA.

Respondent would have this Court ignore how Petitioner was able to file his amended petition; the district court

"presume[s] the correctness of the state court factual findings, unless rebutted by clear and convincing evidence, and [it] review[s] determinations of law, or mixed questions of fact and law, *de novo*." *Smith v. Mitchell*, 348 F.3d 177, 198 (6th Cir. 2004) (citations omitted).

### 3.        Analysis

Petitioner has established that a *Brady* violation occurred during his trial. As a result, the district court erred in denying Petitioner habeas relief.

### a.          Legal Framework

In *Brady v. Maryland*, the Supreme Court held that the prosecution has a constitutional obligation under the Due Process Clause of the Fourteenth Amendment to disclose exculpatory evidence that is material to either guilt or punishment. 373 U.S. 83, 87 (1963). The Court emphasized that the purpose of such a rule was "avoidance of an unfair trial to the accused." *Id.* The Supreme Court has held that the *Brady* rule extends to witness impeachment evidence. *See, e.g.*, *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." (internal quotations and citation omitted).).

In order to make a *Brady* claim, Petitioner must prove three elements: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Of the three elements, the Supreme Court has offered the most guidance with respect to prejudice, also referred to as materiality. Materiality is established "if there is a reasonable probability that, had the [suppressed] evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court emphasized four points as to materiality. First,

> a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.* at 434.

---

previously granted his motion to reopen the case that derived from the original petition. While it is certainly true that the district court dismissed this case, it is equally true that the district court undid this action when it reopened this case. Thus, the case before the district court as of its grant of the motion to reopen was that created by the original petition. Moreover, Respondent's claim that nothing existed for the amended complaint to act upon is inconsistent with his own actions: after the district court granted the motion to reopen, Respondent filed a motion to dismiss or, alternatively, a motion for summary judgment. If indeed nothing existed, then Respondent was filing this motion against a non-case, an absurd proposition. When the district court granted the motion to reopen, it resuscitated Petitioner's original complaint that had been previously dismissed. Since this complaint was filed before AEDPA's enactment, AEDPA does not apply.

This is ultimately an academic exercise, as the two claims presented to this Court were not presented to the state courts, and the state courts made no relevant findings of fact or legal conclusions as to these claims. Thus, the more stringent standard of review under AEDPA would have no effect, as there is nothing to review.

Second, materiality is not a sufficiency of the evidence test, meaning that even if the evidence, including the suppressed exculpatory evidence, is sufficient to support the conviction, a party may still maintain a *Brady* claim. *Id.* A party makes a *Brady* claim "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. It is the lack of confidence in the verdict, not the ability to support the verdict with the entirety of the evidence, that is critical.

Third, "once a reviewing court . . . has found constitutional error there is no need for further harmless-error review." *Id.* By definition, if this Court found a *Brady* violation, it would have had to have found a reasonable probability that the result would have differed with the inclusion of the suppressed evidence. In other words, no *Brady* violation is harmless. *Id.* at 436.

Fourth, when the court analyzes materiality, the "suppressed evidence [must be] considered collectively, not item by item." *Id.* This places the attendant burden on the prosecution to look at all potential *Brady* evidence and to determine whether the cumulative effect of such evidence would rise to the threshold level of materiality. *Id.* at 437.

### b.         Application to This Case

### i.          Favorable Evidence

Petitioner points to three pieces of evidence that the prosecution did not disclose: (1) Davenport approached the prosecution to testify against Petitioner, motivated by his desire for a transfer of facilities or for a work release program; (2) shortly after Davenport spoke with the prosecution, the government *nolle prosequied* two counts of grand larceny and two counts of concealing stolen property against Davenport, and Davenport received concurrent sentences for two convictions of concealing stolen property; and (3) the prosecution wrote a letter to the parole board on behalf of Davenport. Petitioner's position is that such evidence was favorable because it would have impeached the testimony of Davenport, the prosecution's key witness and the only source of evidence with respect to premeditation under first-degree murder.

Respondent argues that this evidence was not favorable to Petitioner, because Petitioner has failed to show that an agreement existed between the prosecution and Davenport. Respondent points specifically to the testimony of Miller, who stated that he did not promise anything to Davenport in exchange for his testimony against Petitioner. In other words, there was no connection between Davenport's testimony and his lenient treatment, so that his lenient treatment was not impeachment evidence. In response, Petitioner asserts that *Brady* requires the disclosure of any evidence that may impeach a witness, including evidence outside of an agreement between Davenport and the prosecution.

The parties raise an interesting question not yet addressed by this Court: whether an agreement between the prosecution and a witness is required under *Brady* before the prosecution must disclose evidence of potential or actual lenient treatment. The Supreme Court has not spoken on this issue; it has only found that evidence of an express agreement between a witness and the prosecution is favorable evidence under *Brady*. *Giglio*, 405 U.S. at 152, 154-55.

Two circuits have specifically addressed the circumstance of a tacit agreement between the prosecution and a witness and have found that such an agreement is favorable evidence to be disclosed under *Brady*. In *Wisehart v. Davis*, the Seventh Circuit explained,

> The first and most common [way to impeach a witness based on benefits given to the witness by the prosecution] is by showing that the benefits were given in return for the witness's providing testimony that would help the prosecution. He might have told the prosecutor what he would testify to if called and the prosecutor might have

explicitly agreed to give him specified benefits if he testified consistently with his proffer. . . . Or there might have been a tacit understanding that if his testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge. . . . Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense.

408 F.3d 321, 323-24 (7th Cir. 2005).

The Ninth Circuit has also found that a tacit agreement between a witness and the prosecution is favorable evidence under *Brady*. In *United States v. Shaffer*, a co-conspirator testified against another co-conspirator on narcotics charges. 789 F.2d 682, 685 (9th Cir. 1986). The government failed to disclose that the witness had assets that were acquired with profits from the narcotics operation, and that the government knew about these assets and their nature but did not initiate forfeiture proceedings against the witness' assets. *Id.* at 689. The court concluded that a tacit agreement had been created between the prosecution and the witness whereby the witness could keep his ill-gotten assets in return for his testimony. *Id.* The court responded to the claim that no express agreement had been reached:

The government contends that, because there was no explicit agreement on this matter, it had nothing to disclose. . . . Apparently the government misunderstands the district court's ruling. While it is clear that an explicit agreement would have to be disclosed because of its effect on [the witness'] credibility, it is equally clear that facts which imply an agreement would also bear on [the witness'] credibility and would have to be disclosed.

*Id.* at 690 (internal citations omitted).

The Eighth Circuit has gone even further, holding that *no agreement* between the prosecution and a witness is required under *Brady*, so long as the withheld evidence can impeach the witness. In *Reutter v. Solem*, the prosecution had failed to disclose that its star witness had applied for sentence commutation and that, coincidentally, the hearing for sentence commutation was to take place soon after his appearance at the petitioner's trial. 888 F.2d 578, 581 (8th Cir. 1989). The court found a *Brady* violation, despite the lack of any form of agreement between the prosecution and the witness:

Our conclusion does not depend on a finding of either an express or an implied agreement between [the witness] and the prosecution regarding the prosecution's favorable recommendation to the parole board. The District Court found there was no agreement and this finding is not clearly erroneous. The fact that there is no agreement, however, is not determinative of whether the prosecution's actions constituted a *Brady* violation requiring reversal . . . . We hold that, viewed in the context of petitioner's trial, the fact of [the witness'] impending commutation hearing was material . . . and that petitioner therefore is entitled to relief.

*Id.* at 582. In addition, the court found that the prosecution's comment to the jury that the witness had "nothing that he could gain" from his testimony was "misleading and highly improper" when coupled with the prosecution's failure to disclose the commutation hearing. *Id.* While the court did not decide whether the comment alone would warrant a new trial, it found that it further undermined the court's confidence in the conviction of the petitioner.[4] *Id.*

---

[4]To be clear, the holding in *Reutter* did not rest on the fact that a prosecutor at the petitioner's trial was also a member of the sentence commutation panel that would hear the witness' petition. The Eighth Circuit did not so hold because it was disputed whether the prosecutor in question even voted on the witness' petition. *Id.* at 580. Instead, the

On the other end of the spectrum, the Second Circuit has held that favorable treatment for a witness is insufficient to show an agreement between the prosecution and the witness. In *Shabazz v. Artuz*, two witnesses testified against the petitioner in a shooting death that occurred during a robbery. 336 F.3d 154, 157 (2d Cir. 2003). At the time of their testimony, they were charged with various narcotics and additional offenses. *Id.* at 156. Just as in this case, the prosecutor testified at an evidentiary hearing that he promised nothing to the witnesses in exchange for their testimony. *Id.* at 163. The prosecutor, however, did appear at the sentencing hearing of one of the witnesses and asked the court to show leniency. *Id.* at 165. Moreover, the prosecutor approved a recommendation from the district attorney's office for a lenient sentence for the other witness. *Id.* The petitioner argued that the fact that the two witnesses in fact received favorable treatment after their testimony evidenced an agreement between the prosecution and the witnesses. *Id.* The court disagreed:

> [P]etitioner is correct that [the two witnesses] received a benefit because they testified against him. However, this fact, standing alone, does not establish that, prior to petitioner's trial, the District Attorney's Office promised [the two witnesses] leniency. The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony. That is not to say that a prosecutor may circumvent his *Brady* obligations by failing to reduce to writing a plea agreement or a promise of leniency. . . . We hold only that the fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.

*Id.* In our view, this holding leaves little room for a petitioner to establish a tacit agreement. By definition, a tacit agreement is an unspoken understanding and is identified primarily by actions in a particular context. If a petitioner cannot use favorable action alone on the part of the prosecution to establish an agreement between the prosecution and a witness, the petitioner has a diminished chance to prove a tacit agreement, absent an admission by the parties of the unsaid understanding. Moreover, the language in *Shabazz* that indicates the prosecution need not disclose its intention of aiding a witness absent an actual promise to the witness demonstrates that the Second Circuit is, at the very least, hesitant to view a tacit agreement as favorable evidence under *Brady*.

We find the analysis of the Seventh and Ninth Circuits persuasive and find that a tacit agreement is favorable evidence under *Brady*. No principled reason exists for differentiating between spoken and unspoken agreements between the prosecution and a witness. The relevant fact under *Brady* is whether the evidence is exculpatory or impeaching. An express agreement between the prosecution and a witness is impeaching because it is evidence that the witness has an interest at stake; in other words, the witness is not impartial. *See, e.g., Giglio*, 405 U.S. at 154-55. This same interest and partiality exist under a tacit agreement, and so this evidence would be equally

---

court found:

> Here, the prosecution failed to inform the defense that the state's key witness, Trygstad, had applied for sentence commutation and that when he gave his testimony at petitioner's trial he already had been scheduled to appear before the parole board a few days later. This information obviously could have been used by the defense to attack Trygstad's credibility. We have little difficulty in concluding that the prosecution's failure to disclose this information was a *Brady* violation.

*Id.* at 581. The *Brady* violation derived from the prosecution's failure to disclose that the witness had a sentence commutation hearing directly following the petitioner's trial; the Eighth Circuit never even so much as mentions a prosecutor's disputed involvement with the sentence commutation hearing.

impeaching and thus subject to disclosure under *Brady*. The fact that the agreement is unspoken does not lead to a diminishment of the witness' interest under the agreement.

The Second Circuit's approach in *Shabazz* has the markings of potential prosecutorial abuse. Under *Shabazz*, so long as the prosecution does not make a promise of assistance before the witness' testimony, the prosecution is not compelled to disclose any understanding between the prosecution and the witness. This holds true even if the prosecution in fact intends to reward the witness with favorable treatment. While the *Shabazz* court stated that this "is not to say that a prosecutor may circumvent his *Brady* obligations by failing to reduce to writing a plea agreement or a promise of leniency," 336 F.3d at 165, a prosecutor would be able to circumvent her *Brady* obligations by simply not verbalizing or otherwise memorializing her intent to help the witness. Such a formalistic and technical evasion would eviscerate the *Brady* rule.

Moreover, a tacit agreement in this context is based on the transparent incentives for both the witness and the prosecution. The fact is that a jailhouse informant is one of the least likely candidates for altruistic behavior; his offer to testify is almost always coupled with an expectation of some benefit in return. The prosecution is not naive as to this expectation, and the prosecution also knows that when the value of the informant's testimony reaches a sufficient level, it is in the prosecution's interest to fulfill this expectation. At the most fundamental level, the arrangement is a *quid pro quo*; the informant knows he is giving something of value and expects something in return; the prosecution knows it is receiving something of value, and gives something in return. No written or spoken word is required to understand the nature of this tacit agreement. This is not to say that "a nebulous expectation of help from the state" is sufficient evidence for such an agreement. *Goodwin v. Johnson*, 132 F.3d 162, 187 (5th Cir. 1997). But if a petitioner proves that a witness approached the prosecution to testify with the expectation of some benefit, and that the prosecution understood this expectation and fulfilled the expectation by actually bestowing some benefit, the petitioner has sufficiently demonstrated a tacit agreement that must be disclosed under *Brady*.

This is exactly what occurred in Petitioner's case. Davenport approached the prosecution to testify against Petitioner. The evidence shows that Davenport was seeking some benefit in return; the prosecutor's notes indicate that a building transfer and a work release program were discussed by the parties. The prosecution openly admitted that it knew of Davenport's expectation; Miller testified that "[e]verybody wants something, and I'm sure Davenport wanted something." (J.A. at 476.) While the prosecution claimed that it did not make any formal promises to Davenport, it certainly fulfilled its end of the unspoken bargain; shortly after the initial meeting between the prosecution and Davenport, the district attorney's office that was prosecuting Petitioner's case dropped four criminal charges against Davenport.[5] Moreover, shortly after Petitioner's trial, the prosecutor wrote a letter to Davenport's parole board and requested early parole on behalf of Davenport. In the letter, the prosecutor explicitly noted that he was writing the letter in part because of Davenport's testimony: "Based upon [Davenport's] cooperation, . . . we are requesting that William Davenport be considered for parole at the earliest eligible date." (J.A. at 501-02.) The prosecutor minced no words as to the *quid pro quo* involved with Davenport's testimony. This is abundant evidence of a tacit agreement, and this evidence should have been disclosed to Petitioner.

With respect to this tacit agreement, the district court found that Davenport did indeed approach the prosecution to testify in search of some benefit, so that this evidence should have been disclosed to Petitioner, and we agree. The district court did not mention or analyze the fact that the

---

[5] The record also indicates that shortly after the meeting between the prosecution and Davenport, a state trial court sentenced Davenport to concurrent, as opposed to consecutive, sentences for two counts of concealing stolen property. The record, however, is unclear as to whether the district attorney's office had some influence as to the court's decision, such as a sentencing recommendation. As a result, we make no assumption as to whether the prosecution played any part in the court's favorable treatment to Davenport.

district attorney's office dropped four counts against Davenport; and we find a tacit agreement based on this lenient treatment, so that this information should have been disclosed. Finally, with respect to the prosecutor's letter to Davenport's parole board, the district court found that the letter could not have been disclosed to Petitioner; because the prosecutor wrote the letter after Petitioner's trial, no favorable evidence existed to be disclosed under *Brady*. While the simplicity of the district court's logic is appealing, it does not withstand closer inspection.

Taken to its logical endpoint, the district court's analysis would shield the prosecution's lenient treatment from the *Brady* rule with respect to a tacit agreement so long as the prosecution's actions took place after the petitioner's trial. The error in such a position is that *when* the prosecution makes good on the tacit agreement should not dictate whether the agreement should have been disclosed. It would be inconsistent to find a *Brady* violation when a prosecutor tacitly agrees to write a letter to the witness' parole board and does so before the petitioner's trial, but to not find such a violation with the same tacit agreement when a prosecutor writes the letter after the petitioner's trial. If such a distinction were made, then the prosecution would just wait until the petitioner's trial ended before it provided the witness any benefits to avoid *Brady* disclosure. A tacit agreement must be disclosed regardless of when the prosecution acts upon that agreement. In short, the formation of the agreement, not the execution of the agreement, is the critical point of interest.

An argument can be made that such a rule would chill the prosecution from giving any nondisclosed benefits to a witness after trial for fear that such conduct will jeopardize the results of the trial, even if such nondisclosed benefits were not part of any agreement, express or tacit. While it is theoretically possible for the prosecution to grant a witness benefits after trial that have no connection to the witness' testimony, it is more than a fair assumption that the prosecution generally grants a witness such benefits in exchange for his testimony. The prosecution is also not in the business of altruism; it grants leniency to an informant because it wants that informant's testimony, and it wants to encourage other informants to come forward and testify. A rule requiring disclosure of a tacit agreement regardless of when the prosecution grants leniency recognizes this fact and is necessary to prevent the prosecution from shirking its *Brady* responsibilities by simply waiting until after the petitioner's trial to act on the tacit agreement. As a result, the prosecution should have disclosed its tacit agreement to assist Davenport with early release, even though this assistance took place after Petitioner's trial.

Despite Respondent's argument that the prosecution's leniency towards Davenport was unconnected to his testimony in Petitioner's trial, it is difficult to believe as mere coincidence that shortly after Davenport met with the prosecution, the prosecution dropped two counts of grand larceny and two counts of concealing stolen property against Davenport. It is likewise difficult to believe as coincidence that shortly after the guilty verdict in Petitioner's case, the prosecutor wrote a letter on behalf of Davenport in support of Davenport's early release. These facts, coupled with Davenport's expectation of benefits and the prosecution's acknowledgment of this expectation, are ample evidence of a tacit agreement that should have been disclosed to Petitioner.

Moreover, we agree with the analysis of the Eighth Circuit and find that even absent any agreement, tacit or otherwise, impeaching or exculpatory evidence must still be disclosed to the defendant. In *Reutter*, the court found that even though there was no agreement between the prosecution and its star witness in the defendant's case, the prosecution's failure to disclose that the witness had a sentence commutation hearing after the defendant's trial constituted a *Brady* violation. 888 F.2d at 582. The key question is whether the evidence is exculpatory or impeaching. *Id.* As the dissent readily admits, the fact that Davenport was shopping to exchange his testimony for benefits was impeaching information that should have been disclosed, even absent any agreement. Petitioner could have used this evidence to demonstrate that Davenport was testifying as an interested witness. Likewise, the fact that the government dropped four criminal counts against Davenport right before Petitioner's trial was also potentially impeaching evidence. Even if there

were no agreement or *quid pro quo* between Davenport and the government with respect to this favorable treatment, Petitioner could have argued that said favorable treatment colored or biased Davenport's testimony by encouraging Davenport to testify in a manner advantageous to his benefactors. This fact therefore should have been disclosed.

### ii.     Suppression by the Prosecution

The district court found that the prosecution did not disclose the fact that Davenport approached the prosecution to testify against Petitioner in expectation of some benefit, and this finding is not clearly erroneous. The district court made no finding as to the disclosure of the tacit agreement with respect to the *nolle prosequied* counts against Davenport, so there is no factual finding to review under the clearly erroneous standard. From our review of the record, there is nothing that indicates that this information was disclosed to Petitioner. The district court also made no factual finding as to the disclosure of the tacit agreement to assist Davenport at his parole hearing, and we find that this information was not disclosed to Petitioner.

With respect to the element of suppression, Respondent "submits that petitioner had access to the material upon which he bases his claim, namely Davenport's parole records and prior convictions." (Resp't Br. 24.) This argument fails for two reasons. First, if Petitioner had searched Davenport's parole records and prior convictions before trial, Petitioner could not have found that Davenport approached the prosecution shopping for a deal for his testimony, that the district attorney's office dropped four counts against Davenport after a meeting with the prosecution, or that the prosecution had a tacit agreement to provide Davenport assistance with his parole hearing. Thus, the basis of Petitioner's *Brady* claim could not have been discovered through a search of Davenport's parole records and prior convictions.

Second, and more importantly, assuming *arguendo* that the basis of Petitioner's *Brady* claim could indeed have been found in these records, Petitioner was under no obligation to second guess the prosecution's representation that no impeaching evidence existed as to Davenport. As explained above, once the prosecution responded to Petitioner's request for impeaching evidence, Petitioner was under no duty to engage in further investigation to determine whether the prosecution's response was truthful. *See Banks*, 540 U.S. at 695 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."). The Supreme Court rejected a similar argument in *Strickler*; there, the prosecution claimed that the basis of the petitioner's *Brady* claim was contained in the prosecution's file, and that the prosecution had an "open file" policy so that the petitioner could have discovered the relevant evidence. 527 U.S. at 276. The Supreme Court found that despite the open file policy, the prosecution suppressed the exculpatory evidence because it represented that it had produced all the *Brady* information in the file. *Id.* at 289. Likewise, even if the basis of Petitioner's claim could have been discovered through a search of Davenport's parole records and prior convictions, Petitioner could rely on the prosecution's representation that no exculpatory or impeaching evidence was available so as to make such a search futile.

### iii.      Materiality

In order to assess the materiality of the suppressed evidence, we analyze the importance of Davenport's testimony, the strength of the prosecution's remaining case, and the strength of Petitioner's defense.

### (1).      Davenport's Testimony

Both Petitioner and the prosecution readily admit that Davenport's testimony was critical. Davenport was the prosecution's final witness; the prosecution admitted that it did not have a strong case without Davenport's testimony. Davenport's testimony was critical in two respects: it negated Petitioner's identity defense by specifically naming Petitioner as the shooter; and it provided the only evidence as to premeditation with respect to the killing of Mrs. Wallace, as Davenport testified that Petitioner had told him that he shot Mrs. Wallace because she was a witness to the shooting of Mr. Wallace.

### (2).      The Prosecution's Remaining Evidence

The remaining case against Petitioner was somewhat insubstantial and entirely circumstantial. There were no eyewitnesses who could positively identify Petitioner as the shooter. The police never found the murder weapon. Laboratory results indicated that Petitioner could have fired a gun. When Petitioner was arrested, he was found with the same type of bullets used to shoot the victims. The spent cartridges at the crime scene also matched spent cartridges found at Petitioner's camp. On the other hand, laboratory results indicated that there was no blood on Petitioner's clothes.

### (3).      Petitioner's Defense

Petitioner's defense was also anemic. Petitioner claims that he and another man purchased .38 caliber bullets for this man's gun. Petitioner then shot the gun for target practice at his camp. Petitioner then left his camp, returned, left again, and he was then arrested.

The prosecution presented Billy Joe Camden ("Camden") as a rebuttal witness. Camden testified that he purchased .38 caliber bullets at Petitioner's request. After purchasing these bullets, Camden left Petitioner.

### (4).      Reasonable Probability of a Different Result

We hold that had the prosecution disclosed to Petitioner its tacit agreement with Davenport and its attendant benefits, there would have been a reasonable probability of a different result as to both Petitioner's conviction for first-degree murder and his conviction for second-degree murder. When considered cumulatively, the suppressed agreement was strong impeachment evidence of Davenport. Because of his testimony, Davenport dodged four criminal counts and secured a recommendation from the prosecutor for early release. In addition, not only did the prosecution fail to disclose this tacit agreement, but the prosecution went further and misrepresented to the jury that it had no "say-so" with Davenport's parole board. The evidence of the parole board's decision suggests otherwise; in the "Notice of Board Action," the parole board granted Davenport early release, indicating under "Final Board Action" to "see DA's letter supporting parole." (J.A. at 498.) Not only did the prosecution's letter influence the parole board's decision, it appears to have been the basis of the board's decision. Certainly the prosecution cannot require action of the parole board, as prosecutor Miller so testified, but the actual decision of the parole board is proof positive that the prosecution does have influence with the parole board. Moreover, the fact that the parole board took heed to the prosecution's recommendation that Davenport be paroled is no novel outcome; a prosecutor may appear on behalf of a potential parolee or give similar assistance, and

the parole board, while not required to act according to the wishes of the prosecutor, often takes into consideration the prosecutor's recommendation. Miller's proclamation to the jury that he had no "say-so" with the parole board was therefore misleading.

The harm from the prosecution's misrepresentation to the jury is similar to that in *Reutter*, where the Eighth Circuit found that the prosecution's statement to the jury that the witness had nothing to gain from testifying exacerbated the *Brady* violation in light of undisclosed evidence that the witness was seeking a commutation of his sentence. 888 F.2d at 582. In this case, the prosecution failed to disclose its tacit agreement to aid Davenport at his parole hearing; additionally, the prosecution then told the jury that it had no power to aid Davenport at his parole hearing, despite the fact that it could do so and did do so. In other words, the prosecution's statement bolstered Davenport's testimony by portraying Davenport as a man testifying without benefit, when in fact his testimony should have been questioned because of the actual benefits he realized therefrom. The tacit agreement, the *nolle prosequied* counts, the letter to the parole board, and the prosecution's misrepresentation are sufficient to establish materiality.

Materiality is especially apparent in light of the prosecution's remaining evidence. With respect to first-degree murder, Davenport's testimony was the only evidence of premeditation as to the shooting of Mrs. Wallace. There is a reasonable probability that, had the jury been made aware of Davenport's agreement with the prosecution, a different result would have occurred, as proof of one of the required elements of first-degree murder would have been in doubt. With respect to Petitioner's conviction of second-degree murder of Mr. Wallace, Davenport's testimony was the strongest piece of evidence presented by the prosecution, as it positively identified Petitioner as the shooter. With the veracity of the testimony in doubt, the prosecution would have had to rely on the circumstantial evidence that Petitioner was carrying the same type of bullets that were used to kill the victims, and that spent cartridges found at the crime scene matched spent cartridges found at Petitioner's camp. The prosecution's case was also negated by the fact that no blood was found on Petitioner's clothes, and Petitioner's testimony that he fired a .38 caliber handgun that belonged to Camden at Petitioner's camp. These facts sufficiently demonstrate a reasonable probability of a different result with the impeachment of Davenport's testimony. In the words of the Supreme Court, Petitioner did not receive "a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

We emphasize that the materiality prong is not a sufficiency of the evidence test, nor is the inquiry whether Petitioner more likely than not would have been acquitted. The question is whether the withheld evidence would have "put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Had the jury been made aware of Davenport's substantial interest in his testimony against Petitioner, the jury's view of the case would have been significantly colored by this impeachment evidence. Of critical importance is how Davenport's testimony interacted with the remainder of the evidence and the theory presented by the prosecution. Davenport's testimony significantly corroborated what the circumstantial evidence could only imply as to the events surrounding the shooting. Had the prosecution made available the appropriate impeaching evidence, not only would Davenport's testimony have been shrouded in doubt, his testimony's corroboration of the prosecution's theory vis-a-vis the circumstantial evidence would also have been weakened. There is simply no way to know how the jury would have viewed the remaining circumstantial evidence with Davenport's credibility placed into question, such that one cannot safely say that Petitioner received a fair trial.

Moreover, we disagree with the district court's assessment of materiality. We first note that the district court did not consider in its materiality analysis the *nolle prosequied* counts or the prosecution's letter to the parole board. It also did not consider the prosecution's misrepresentation to the jury. These facts alone demonstrate that the district court erred in its materiality analysis. Furthermore, the district court found that materiality was lacking because "Davenport's offer to

testify and statements to the prosecutor were disclosed," and because "Davenport's criminal history and his interest in parole eligibility were presented to the jury." (J.A. at 580.) We will address these points in turn. While the jury knew Davenport offered to testify, they did not know *why* Davenport offered to testify: he wanted to exchange his testimony for leniency. A witness' offer to testify is not inherently impeaching; a witness may testify for any number of reasons that do not cast doubt as to his testimony. What makes a witness' testimony suspect is an offer to testify for a self-interested motive, and complete evidence of Davenport's self-interest was never fairly presented to the jury.

With respect to Davenport's criminal history, we agree that Petitioner was afforded the opportunity to impeach Davenport with his criminal history, but this is a *non sequitur*; the fact that Petitioner was able to impeach Davenport with his criminal history does not answer his inability to impeach Davenport with other crucial evidence that Davenport had an interest in the testimony. The Supreme Court has spoken directly on this type of argument: "[W]e do not believe that the fact that the jury was apprised of *other grounds* for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one." *Napue v. Illinois*, 360 U.S. 264, 270 (1959) (emphasis supplied). This language applies with equal force to Respondent's argument that the jury knew of Davenport's interest in parole eligibility. Again, while the jury was made aware of this interest, Davenport's interest in currying favor with the parole board was wholly separate from Davenport's interest in receiving lenient treatment from the prosecution in the form of the *nolle prosequied* counts and the recommendation letter to the parole board. The impeachment evidence actually presented at trial does not act as a constitutional substitute for the impeachment evidence suppressed by the prosecution.

In short, Davenport's testimony was the crux of the prosecution's case as to both first- and second-degree murder. Had Davenport's testimony been properly impeached, there is a reasonable probability that the result would have been different for both of these charges.

**B.      THE DISTRICT COURT DID NOT ERR IN DENYING RELIEF ON THE PETITIONER'S CLAIM THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT EVIDENCE THAT HE LACKED THE *MENS REA* NECESSARY FOR FIRST-DEGREE PREMEDITATED MURDER.**

**1.      Preservation of the Issue**

Respondent argues that this Court may not review Petitioner's ineffective assistance of counsel claim because he failed to raise the claim before any state court. We agree.

As explained above, when a petitioner's claim is procedurally defaulted in state court, the federal courts may not review the claim on habeas review unless the petitioner shows cause and prejudice. Here, Petitioner failed to exhaust his state remedies with respect to his ineffective assistance of counsel claim. Because a state procedural rule would bar Petitioner from raising this claim in state court, Petitioner's claim is procedurally defaulted. *See supra*.

Petitioner argues that in fact he raised the substance of his claim before a state court, so that he exhausted his state court remedies and his claim is not procedurally defaulted. We disagree. Petitioner did raise a claim of ineffective assistance of counsel in his state post-conviction hearings, but this claim was based only on two underlying claims: (1) counsel's failure to object to "and raise on appeal the admissibility of a lay opinion offered by a state's witness on the mental condition of the dying victim," *Bell v. State*, 1994 WL 406168, at *4; and (2) counsel's failure to "raise the issue as to whether a rational trier of fact could find beyond a reasonable doubt [Petitioner] was guilty of murder in the first degree absent proof of deliberation," (J.A. at 123). Petitioner never raised the

underlying claim that counsel failed to investigate and present evidence of alcoholism and mental illness. In determining whether a claim has been fairly presented to the state courts, this Court looks to whether "the petitioner asserted both a factual and legal basis for his claim in state court." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003). In this case, Petitioner did not assert either; Petitioner never presented to the state courts the factual basis of his trial counsel's failure to investigate or present evidence of alcoholism and mental illness; likewise, Petitioner did not present the legal basis that such action was objectively deficient performance and prejudicial under *Strickland v. Washington*, 466 U.S. 668 (1984).

Petitioner's citation to *Vasquez v. Hillery*, 474 U.S. 254 (1986), is to no avail. That case involved a petitioner who claimed that the state systematically excluded blacks from the grand jury which eventually indicted him. *Id.* at 256. The petitioner made this claim on both direct review and state habeas review. *Id.* On federal habeas review, the district court ordered statistical evidence as to the grand jury service of blacks in the relevant county, and it also ordered the parties to present evidence of statistical significance, *i.e.*, the probability that blacks were excluded from the jury not by deliberate design but by "chance or accident alone." *Id.* at 257. The Supreme Court held that the district court could view this additional evidence without running afoul of the state exhaustion requirement despite the fact that such evidence was not presented to the state courts. *Id.* at 258. The Court found that

> the circumstances present no occasion for the Court to consider a case in which the prisoner has attempted to expedite federal review by deliberately withholding essential facts from the state courts. We hold merely that the supplemental evidence presented by respondent did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that respondent be remitted to state court for consideration of that evidence.

*Id.* at 621-22. The instant case is easily distinguishable; while the petitioner in *Hillery* was only looking to present supplemental evidence for the same claim, Petitioner here is attempting to add an entirely new underlying claim to his claim of ineffective assistance of counsel. This would work a fundamental alteration to the legal claim already considered by state courts, so that we cannot say that the state courts had the first opportunity to review the claim. *See Coleman*, 501 U.S. at 731 ("[I]n a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."). The state courts were never presented with the issue of ineffective assistance of counsel due to counsel's failure to investigate and present evidence of alcoholism and mental illness, and we agree with those circuits that have held that an ineffective assistance of counsel claim based on one ground does not exhaust state court remedies with respect to an ineffective assistance of counsel claim based on another ground. *See Sweet v. Bennett*, 353 F.3d 135, 139-140 (2d Cir. 2003); *Tippitt v. Lockhart*, 903 F.2d 552, 554 (8th Cir. 1990); *Gibson v. Scheidemantel*, 805 F.2d 135, 139 (3d Cir. 1986).

The question now is whether Petitioner has demonstrated cause and prejudice for his default, and we conclude that Petitioner has not done so. Petitioner argues that he has cause for not raising this claim before a state court, because the state courts did not provide funding for expert witnesses such as Dr. Auble. This fact does not constitute cause; even without expert witness testimony, Petitioner could have still made a viable claim as to ineffective assistance of counsel due to counsel's failure to investigate and present evidence of Petitioner's alcoholism and mental illness. Petitioner could have simply shown that there were records of his conditions sufficient to support a defense, and that counsel did not investigate and thus did not present this evidence.

Petitioner also argues that he has cause for not raising the claim before a state court because of the ineffective assistance of counsel during his state post-conviction proceedings. The problem with Petitioner's position is that attorney error can only be considered cause if the error meets the

threshold of ineffective assistance of counsel in violation of the Sixth Amendment. *Coleman*, 501 U.S. at 752 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Petitioner, however, does not have a constitutional right to effective assistance of counsel during state collateral proceedings. *Id.* (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)). Petitioner argues that because ineffective assistance of trial counsel is a claim that can first be brought at a state post-conviction proceeding, Petitioner is entitled to effective assistance of counsel at the post-conviction proceeding. This Court has specifically rejected that argument, finding that a petitioner must bear the risk of attorney error at such proceedings. *Abdus-Samad v. Bell*, 420 F.3d 614, 631-32 (6th Cir. 2005).

With respect to prejudice, Petitioner's claim lacks merit, so that he cannot establish prejudice. *See infra*.

### 2.      Standard of Review

When a district court denies a habeas petition, this Court reviews its legal conclusions *de novo* and its factual conclusions for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

Because Petitioner filed his habeas petition prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the pre-AEDPA standard of review applies with respect to the conclusions of the state courts. Under this standard, the Court "presume[s] the correctness of the state court factual findings, unless rebutted by clear and convincing evidence, and [it] review[s] determinations of law, or mixed questions of fact and law, *de novo*." *Smith v. Mitchell*, 348 F.3d 177, 198 (6th Cir. 2004) (citations omitted).

### 3.      Analysis

While we find that Petitioner's claim is procedurally barred, we also note that Petitioner's claim lacks merit. Petitioner's trial counsel conducted a reasonable investigation as to Petitioner's alcoholism and mental health, and Petitioner was the party ultimately responsible for deciding against presenting evidence of Petitioner's alcoholism and mental health.

### a.      Legal Framework

Under *Strickland v. Washington*, a petitioner may establish a claim of ineffective assistance of counsel if he shows that: (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense in that there is a reasonable probability that but for the deficient performance, the result of the proceeding would have been different. 466 U.S. at 687-88, 694.

Under *Strickland*, trial counsel has a duty to investigate his case:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are

usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* at 690-91.

### b.      Application to This Case

Petitioner's counsel conducted reasonable investigations into Petitioner's alcoholism and mental health. Counsel requested an initial mental health evaluation of Petitioner due to Petitioner's admitted substance abuse problems and his blackouts on the day of the crime. Counsel also conducted an initial investigation as to Petitioner's alcoholism, unearthing records from various mental health and medical facilities. Counsel believed that Petitioner's best defense was an intoxication defense, but Petitioner insisted on a defense of identity. This was true even after counsel explained to Petitioner other available defenses.

At that point, counsel's failure to further investigate Petitioner's alcoholism and mental health was completely reasonable, as Petitioner effectively told him to stop investigating these defenses, because Petitioner's defense of choice was identity. To reiterate the words of the Supreme Court, "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* at 690. Petitioner made a strategic decision to pursue an identity defense at trial, even though trial counsel believed intoxication was the best defense. Petitioner cannot now rest the blame of that strategic decision on the shoulders of his counsel; his counsel rightfully halted the investigation into Petitioner's alcoholism and mental health at Petitioner's request.

The point is that counsel must make reasonable investigations into all potential defenses, or have a reasonable explanation why such investigation would be unnecessary, and counsel must present these defenses so Petitioner could make an informed decision: "A good lawyer tries to persuade the accused to make a wise decision about . . . presenting a defense, *even though the ultimate decision rests with the client*, and wretched advice that leads the accused to make a bad decision is a form of ineffective assistance. The accused is entitled to the information essential to make an educated choice." *Wallace v. Davis*, 362 F.3d 914, 920 (7th Cir. 2004) (emphasis supplied). Here, counsel made a reasonable investigation into Petitioner's mental health and alcoholism, and he told Petitioner that he thought an intoxication defense was Petitioner's best choice. Petitioner's decision to forego this defense and to pursue a defense of identity was thus informed, so that Petitioner cannot claim ineffective assistance on the part of his counsel. As the Second Circuit recently observed, "[T]o the extent that defendant instructed his counsel to pursue a course of action that defendant now complains of, there was no abridgement . . . of defendant's Sixth Amendment right to effective assistance of counsel." *United States v. Wellington*, 417 F.3d 284, 289 (2d Cir. 2005). *See also Stano v. Dugger*, 921 F.2d 1125, 1151 (11th Cir. 1991) ("When a defendant preempts his attorney's defense strategy, he thereafter cannot claim ineffective assistance of counsel." (citation omitted)); *Alvord v. Wainwright*, 725 F.2d 1282, 1288-89 (11th Cir.

1984) (holding that counsel's failure to present an insanity defense was not ineffective assistance when the defendant refused to allow an insanity defense and insisted on relying upon a weak alibi).

Petitioner's related claim that his counsel failed to present a complete defense[6] is also meritless and warrants only a few brief words. A defense of identity and a defense of intoxication are inconsistent. *See, e.g.*, *Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir. 1998) ("Pursuing a diminished capacity defense would have been inconsistent with [the petitioner's] complete denial of involvement in the robbery."). Petitioner could not have successfully argued that he did not shoot the victims, but if he did, he was drunk and did not remember. Petitioner chose the defense of identity, and his counsel provided a complete defense under that chosen strategy.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the district court and **GRANT** the petition for writ of habeas corpus. The district court shall enter an order requiring Petitioner to be released from custody unless the State of Tennessee commences a new guilt phase trial within 180 days of the district court's order.

---

[6]This statement is made in Petitioner's Statement of Issues but is not explained in the substance of Petitioner's Brief. We will nevertheless address the point, as it can be disposed of easily.

---

### CONCURRING IN PART, DISSENTING IN PART

---

JULIA SMITH GIBBONS, Circuit Judge, Concurring in Part and Dissenting in Part.  I concur in the majority opinion as to Bell's ineffective assistance of counsel claim, but disagree with the majority's disposition of Bell's *Brady* claim.  The majority holds that the prosecutor had a "tacit understanding" with the witness and was required to disclose this agreement to the defense under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), even though no probative evidence of such an agreement exists.

Bell relies on three pieces of evidence in support of his *Brady* claim.  All are related to the testimony of William Davenport, a convicted felon who was held with Bell in the Nashville jail.  Davenport approached Ross Miller, Bell's prosecutor, seeking either a transfer of facilities or participation in a work-release program.  This request, which was recorded in Miller's notes, was not divulged to the defense as required by *Brady*.  Second, prior to Bell's trial, several of Davenport's pending counts were *nolle prosequied* by another prosecutor as part of a plea bargain that resulted in a three-year sentence for Davenport on other counts in his indictment.  The defense was not informed of the outcome of Davenport's case.  Third, Miller sent a letter to the parole board on Davenport's behalf after the trial ended, recommending parole "at the earliest possible date."  Davenport was, in fact, granted early parole.  The only undisclosed material at the time of trial was thus Miller's notes and Davenport's sentencing documents.

The majority holds that the prosecution was required to disclose the first two pieces of cited evidence and that all three pieces of evidence were sufficient to prove the existence of a wrongfully-suppressed, implied agreement with Davenport to grant him benefits in exchange for his testimony.  Further, the majority holds that the parole letter – or at least the prosecution's agreement to write such a letter – was wrongfully withheld because it was a tangible result of this purported tacit agreement.  The evidence in this case, however, does not support a determination that the prosecution entered into a tacit agreement with Bell.  In addition, while Miller should have disclosed the notes regarding Davenport's request for a transfer and Davenport's sentencing documents,[1] this evidence is not material, so the prosecution's suppression of it did not violate *Brady*.

I.

I first consider the majority's reasoning regarding the purported tacit agreement between the prosecution and Davenport.  The majority is certainly correct that the prosecution must divulge an express agreement with a witness in relation to that witness's testimony, regardless of whether the agreement is written or oral.  *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  In its opinion, however, the majority extends *Giglio*'s holding to encompass a situation where a witness merely hoped for a future benefit and received one.  In so doing, it mischaracterizes the hope and the benefit as an agreement and mischaracterizes our sister circuits' precedent.

Beginning with the majority's finding of an agreement, a primary component of its faulty reasoning is its speculation that Davenport's plea bargain and sentencing prior to Bell's trial had a connection to Davenport's testimony.  Yet no evidence supports such a connection.  No evidence permits an inference that either the prosecutor or judge in Davenport's case knew that Davenport

---

[1]Both items were required to be disclosed as impeachment material. *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule.").  The notes of the transfer request were evidence that Davenport hoped for favorable treatment for his testimony.  The sentencing documents reflected Davenport's prior criminal convictions.

had approached Miller or that Miller anticipated that Davenport would testify for the state at Bell's trial. The reality of this record is that Davenport asked for the benefit of a transfer or participation in work release and probably hoped that some other favorable treatment might come his way as a result of his testimony. Davenport's more general hopes were realized when Miller recommended an early parole after Bell's trial, although his specific requests were not granted. There is nothing more. Miller denied any agreements with Davenport or any promises to him.

The majority also goes astray in relying on three cases to support its inference of a tacit agreement between a witness and the prosecutor based on lenient treatment of the witness. *See Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005); *Reutter v. Solem*, 888 F.2d 578 (8th Cir. 1989); *United States v. Shaffer*, 789 F.2d 682 (9th Cir. 1986). While the majority is correct to find some support in these cases for the proposition that implied agreements must be disclosed, none of the cases supports the majority's ultimate conclusion.

The Seventh Circuit noted in *Wisehart* that an implied agreement must be disclosed, 408 F.3d at 324, but that court expressly declined to find such an agreement based solely on a testifying witness's lenient treatment in a plea bargain. *Id.* at 325. Instead, the court *denied* Wisehart's *Brady* claim for several reasons. First, the court noted the difficulty in determining when a "tacit agreement" existed; the commonplace nature of plea bargaining – and the leniency inherent in and necessary to the bargaining process – would require intense scrutiny of all witnesses and would imply agreement in nearly all similar cases. *Id.* Second, the court noted the minimal impeachment value of such leniency once charging practices were explained to the jury. *Id.* The fact that Johnson expected to benefit by his testimony was immaterial: "A criminal trial must not be allowed to turn into an inquiry into disparate treatment of criminals, with the witness being asked whether he'd received any benefit that he would not have received had the state not wanted his testimony and whether therefore he feared retaliation if he stopped playing ball." *Id.* at 325-26. The holding in *Wisehart* was squarely in line with Seventh Circuit precedent. In *Todd v. Schomig*, a prior Seventh Circuit panel rejected a similar claim where a witness had an "expectation of benefit" from his testimony, concluding that "[w]ithout an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation." 283 F.3d 842, 849 (7th Cir. 2002).

The majority opinion also considers and rejects the Second Circuit's ruling in *Shabazz v. Artuz*, 336 F.3d 154 (2d Cir. 2003), which reached the same result. In that case, the court denied a claim for disclosure of an implied agreement where, as is the case here, the prosecutor testified that no agreement existed even though the witnesses' own trials were postponed and the witnesses received lenient treatment in sentencing after testifying. The court rejected this evidence of an implied agreement even though it found "inescapable" the conclusion that the lenient treatment was related to the testimony. *Id.* at 165. The court reasoned that "[t]he government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony." *Id.* (emphasis in original).

Unlike *Wisehart* and *Shabazz*, the *Shaffer* court did find an implied agreement between the prosecutor and witness. It is similarly unhelpful as support for the majority's position, however, because the facts are quire different from this case. The court in *Shaffer* determined that a tacit agreement existed between the prosecution and the witness in light of extensive evidence showing that the witness, a co-conspirator in a heroin transaction, received financial benefits from the government in connection with the transaction, escaped asset forfeiture proceedings related to the transactions, and was allowed to escape liability for tax violations despite a representation by the government in court that it would require the witness to pay the taxes. 789 F.2d at 689. The benefits to the witness were thus unusual, and the prosecutor did not specifically deny an agreement.

Finally, in *Reutter*, the prosecutor was one of three members of the parole board that was scheduled to hear the witness's commutation petition. The witness's hearing was delayed several times without reason and eventually occurred immediately after trial. The parole board granted the commutation petition. The court argued that had the defense been apprised of the rescheduling of the commutation hearing, the defense would have been able to mount a more effective challenge to the witness's credibility. The court therefore found the suppression of this evidence to be material, especially in light of the prosecutor's explicit representation to the jury that the witness could not benefit from his testimony. 888 F.2d at 581-82. Thus, the *Reutter* court did find a *Brady* violation. It expressly declined to rely on – or even discuss in any depth – a finding that the prosecutor and witness had an implied agreement, 888 F.2d at 582 ("Our conclusion does not depend on a finding of either an express or an implied agreement . . ."), and upheld the district court's determination that no such agreement existed. *Id.* The *Reutter* court's holding, rather, relied solely on the independent materiality of the suppressed information. That is, the non-disclosed facts were so suspicious as to render an implied agreement finding duplicative and therefore unnecessary. As a result, *Reutter* has no bearing on the implied agreement question raised here.

The holdings in *Wisehart* and *Shabazz* are well-reasoned. When applied to this case, they highlight why the evidence in this case is insufficient to support the finding of an implied agreement between Miller and Davenport. First, as in *Shabazz*, Miller expressly testified that he had reached no such agreement. Miller specifically stated at the evidentiary hearing in this case that, "*I didn't promise Davenport anything, and I didn't make any agreements with him*, but he testified at trial against someone I thought was dangerous, and I felt that he would now be labeled as a snitch, and it might be best that I did whatever I could do to get him out of prison, whenever the parole board thought would be eligible."

Second, the treatment of Davenport was well within the range of normal prosecutorial behavior. The *nolle prosequied* counts were part of a plea agreement that was completed prior to Davenport's testimony. Given the joint incentives to defer such charging decisions until after the testimony when the testimony is a condition of leniency, *see Shabazz*, 336 F.3d at 163, the timing of the plea here could actually suggests that the parties had *no* agreement regarding those charges.

Third, though the prosecutor's letter to the parole board is evidence of a benefit given by Miller to Davenport, such benefits are common and are not necessarily the result of an agreement between the prosecution and the witness prior to testimony. There are other reasons for such a letter; here, Miller testified that he recommended leniency in part due to concern that Davenport would be targeted by other inmates as a "snitch" due to his testimony in Bell's case. The ambiguity of purpose behind the parole letter minimizes its usefulness in determining whether an implied agreement existed prior to trial. As the *Shabazz* court noted, the government is *permitted* to reward witnesses for their testimony.

The result of the majority's dual error of mischaracterizing the evidence and the precedent is an expansion of the definition of *Brady* violation to include nondisclosures of witness treatment never previously considered by any court to be within *Brady*'s ambit. When the majority asserts that denying Bell relief here would leave[] little room for a petitioner to establish a tacit agreement," it simply overlooks the fact there are many fact patterns, as in *Shaffer*, that may provide a proper basis for finding a tacit agreement. Now, the majority's result leaves little room for finding no agreement, even when the evidence fails to support its existence. Like the *Shabazz* court, I would hold that "favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony." 336 F.3d at 165.

## II.

Although Miller did not violate *Brady* in failing to disclose a tacit agreement, he did not disclose the notes from his meeting with Davenport and Davenport's sentencing documents,[2] both of which could have been used for impeachment. Thus, the failure to disclose them was contrary to the requirements of *Brady* and its progeny. *United States v. Bagley*, 473 U.S. 667, 676 (1985). The inquiry then is whether the undisclosed evidence is sufficiently material to constitute constitutional error. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The Supreme Court has held that evidence is material when disclosure of the suppressed evidence would create a reasonable probability of a different result. *Bagley*, 473 U.S. at 678. I conclude that the suppressed evidence here is insufficient to create a reasonable probability of a different result because its impeachment value is minimal and because defense counsel Ross Alderman effectively impeached Davenport's credibility at trial.

At Bell's trial, Davenport testified that Bell admitted committing the murders. Alderman attacked Davenport's testimony on cross-examination, arguing that Davenport was an incredible witness due to his prior criminal history, his prior membership in the Ku Klux Klan, and the fact that he might receive early parole in exchange for his testimony. In his closing argument, Alderman again noted Davenport's criminal and parole status:

> [Y]ou have got to decide whether you want to believe somebody who was on parole, violated that parole, was in jail, all this involving a crime involving fraud and false dealings, theft . . . . I [Davenport] want you to believe [my testimony] . . . because I have got a parole hearing coming up in a matter of months and if I can go to the Parole Board and I can say, 'I have helped convict Stephen Michael Bell,' that they might cut me some slack because they violated my last parole when I committed another crime . . . . That is why I called the District Attorney's office; that is why I spoke to the police and the District Attorney and that is why I came to testify, but you believe me.

The documentary evidence of Davenport's guilty plea and request for facility transfer in connection with his testimony might have bolstered Bell's credibility argument, but the benefit thus accrued would have been minimal. *See Wisehart*, 408 F.3d at 325. Further, the suppressed evidence would not have allowed Bell to develop any new or different lines of argument or testimony. Given Alderman's cross-examination of the witness based on the parole issue and his argument at closing, disclosure of the withheld *Brady* material could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitney*, 514 U.S. 419, 435 (1995).

For the foregoing reasons, I would affirm the decision of the district court and deny Bell's petition for a writ of habeas corpus.

---

[2]The parole letter was not created until after trial, and therefore could not be disclosed absent an implied agreement.