In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2911

ROBERT W. DEKELAITA,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-06682 — **Matthew F. Kennelly**, *Judge.*

ARGUED JANUARY 23, 2024 — DECIDED JULY 24, 2024

Before ROVNER, BRENNAN, and PRYOR, *Circuit Judges.*

BRENNAN, *Circuit Judge.* A jury found Robert Dekelaita, a former immigration attorney, guilty of various crimes for conspiring with clients, interpreters, and his employees to defraud the United States by submitting fabricated asylum applications.

Unsuccessful in his direct appeal, Dekelaita moved to vacate his sentence under 28 U.S.C. § 2255. The district court

authorized broad discovery, conducted a thorough, weeklong hearing, evaluated the parties' post-hearing briefs, and denied his motion. Dekelaita now appeals that decision. He contends the district court erred in its rulings about benefits the government provided to some witnesses, before and after trial.

The undisclosed information about pre-trial benefits was immaterial, so the district court correctly denied Dekelaita's claims as to those benefits. And Dekelaita's rights were not violated because some of the alleged post-trial benefits were not promised to witnesses, while others would not have affected the trial's outcome had they been disclosed. Thus, we affirm.

## I. Background

### A. Criminal Activity, Trial, and Conviction

Dekelaita was an attorney licensed to practice in Illinois beginning in 1997. In 2000, he opened his own law firm which specialized in immigration law. In his practice, Dekelaita represented foreign nationals applying for asylum, citizenship, and other immigration benefits from the U.S. government.

Some of these foreign nationals were Middle Eastern Christians. Upon seeking assistance to gain asylum in the United States, Dekelaita would discuss the client's background, disparage the client's chances of securing asylum with their true story, and offer to create a fraudulent story instead. With assistance, he would submit a fictitious claim to United States Citizenship and Immigration Services ("USCIS"), often including tales of rape, false arrests, murder, and torture—all characteristics of persecution. On the asylum applications, Dekelaita would alter the country of origin,

modify dates of travel, change last names, and instruct the client to obtain false documentation. Depending on the client, Dekelaita would instruct the client to conceal the client's citizenship or legal status in other countries where the client was not at risk of persecution. His clients were instructed to memorize these fabricated stories but often could not because of their length and complicated facts.

Dekelaita needed the assistance of interpreters, Yousif Yousif and Adam Benjamin, to perpetuate the fraud. Dekelaita instructed the interpreters to help clients memorize false information in their applications and provide fraudulent translations at asylum interviews to corroborate the fabricated stories. At pre-interview meetings, Dekelaita or the interpreter would coach the client to say a random phrase in neo-Aramaic if the client forgot a detail of the story. The interpreter would then fill in the gap. At the asylum interview, the interpreter would falsely translate questions and answers, provide the client with the "correct" answer to a question, or falsely translate a client's "wrong" answers to reflect "correct" information.

During the twelve-day jury trial, nine former clients testified. For each of the client-witnesses, the government said it did not offer benefits, assurances, or promises regarding their future immigration status in the United States.

Before trial, the government disclosed to Dekelaita that it advised the client-witnesses that only three possibilities existed as to their future immigration status: removal, no change in status, or notification to USCIS of cooperation. The government was transparent about this at trial. All the client-witnesses testified that the government had made no

promises or representations about how their testimony might affect their immigration status.

The testimony of one client-witness, Rafida Jabo-Cordova, and her husband, Francisco Cordova, is relevant to this appeal. Jabo-Cordova left Iraq in 1995, renounced her Iraqi citizenship, and became an Ecuadorian citizen in 2002 after marrying her husband, Francisco Cordova. She also held temporary legal status in Switzerland. Given these facts, Dekelaita informed Jabo-Cordova that the best way to secure legal status in the United States would be as an Iraqi asylee. He then submitted an asylum application on her behalf, bearing false information about her name, marital and legal status, and religious persecution. After immigration officials uncovered discrepancies in Jabo-Cordova's paperwork, her asylum application was denied initially and on appeal. Though a motion to reopen was granted, Jabo-Cordova terminated Dekelaita's representation before authorities issued a remand order.

Jabo-Cordova began cooperating with the government while her reopened asylum case was pending. When Dekelaita reached out to Jabo-Cordova, the government instructed her to re-hire him. She then covertly recorded conversations with Dekelaita and his associate attorneys, Alen Takhsh and Allan Jacob. They discussed her fraudulent asylum claim, including the use of false paperwork and fabricated stories.

Before trial, the government disclosed to Dekelaita's counsel that Jabo-Cordova was a long-time cooperator and, because of that cooperation, USCIS provided her with deferred action status. Additionally, the government disclosed she had been told that she would be permitted to stay in the United

States so long as she actively cooperated. At trial, the jury heard from both parties that Jabo-Cordova had been permitted to remain in the United States, despite the government's knowledge of her fraud. Jabo-Cordova testified that she had remained in the United States after her deferred action status expired and that she intended to remain in the United States by obtaining a green card based on her husband's citizenship status.

Francisco Cordova also testified. The day before his testimony, Dekelaita's counsel noted that he had not received Cordova's immigration file from the government. The government responded that the file was available, though not in electronic format, and it was not aware of any evidence of fraud related to Cordova. The district court ordered the government to produce the file anyway. Cordova testified he was naturalized in 2014 while his wife worked as a confidential informant. Before that, though, an issue arose—since he spent several years abroad before returning to the United States on a tourist visa in 2002, he may have abandoned his permanent resident status. Consequently, he said he "probably" had to file an SB1 visa. He also explained his understanding that his SB1 visa had been approved. He was unsure, though, what was done to resolve the abandonment issue before his naturalization. The government disclosed this to Dekelaita prior to trial.

In addition to the testimony of the client-witnesses, Dekelaita's former associate attorney testified about his work for Dekelaita on fraudulent asylum applications and Dekelaita's relationship with the interpreters. The government also presented consensual recordings made by another former Dekelaita client. The recordings showed interpreter

Benjamin's purposeful mistranslation of the asylum officer's questions and the client's responses. This corroborated testimony describing the conspiracy between Dekelaita and the interpreters.

The jury found Dekelaita guilty of a conspiracy to defraud the United States. The district court sentenced him to 15 months' imprisonment, and our court affirmed Dekelaita's conviction. *United States v. DeKelaita*, 875 F.3d 855, 856 (7th Cir. 2017).

### B.  Post-Conviction Proceedings

#### 1.  *Motion for habeas relief and discovery*

Dekelaita moved to vacate his sentence under 28 U.S.C. § 2255. He asserted that his former clients received undisclosed benefits—namely, promises (express or implied) that the government would permit them to remain in the United States following the trial, despite their fraudulent asylum applications. The district court construed Dekelaita's claim as arising under the Fifth Amendment as well as *Napue v. Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*, 373 U.S. 83 (1963). The government moved to dismiss Dekelaita's motion. The court concluded that Dekelaita had articulated a plausible basis for his contention, warranting an evidentiary hearing.

Before the hearing, the district court ordered the government to produce immigration files for the individuals identified in Dekelaita's motion as well as pre- and post-trial communications between the Department of Homeland Security and the government's witnesses.

Dekelaita also filed several motions to compel, seeking records and communications between DHS's Office of Inspector General and Francisco Cordova and communications

between DHS employees and the government's trial witnesses. As to materials relating to Cordova's naturalization, the court ruled this evidence was relevant. But the court denied Dekelaita's requests for testimony of a non-trial witness because it was not "connected with" the § 2255 issues before the court.

The document production that followed revealed substantial communications between the government and the client-witnesses. For the first time, the government disclosed the existence of pre-trial communications and involvement in Cordova's naturalization and Jabo-Cordova's visa approvals. Also unearthed were notes of a pre-trial interview between Cordova and immigration agent Tyler Shoudy; Cordova's immigration file containing naturalization records not produced before or at trial; communications between Shoudy and Cordova's attorney, Dalia Kejbou; communications between Shoudy and an immigration and naturalization officer; and records of inter-agency requests for expedited approval of Jabo-Cordova's visa petition. Last, the production included communications between the government and Kejbou, who, it turned out, had a cooperation agreement with the government.

### 2. *Evidentiary hearing*

The district court held a seven-day evidentiary hearing on the postconviction motion. Nearly 20 witnesses testified, including several of the client-witnesses, agents Shoudy and Louis Chesla, and officials with various government agencies. The evidence at the hearing divides into (a) pre-trial benefits not produced pre-trial and (b) post-trial assistance to government witnesses.

### a. Pre-trial benefits

The evidence of unproduced, pre-trial benefits revolved around Cordova, Jabo-Cordova, Cordova's attorney Kejbou, another client-witness Raman Esho, and the actions of agents Shoudy and Chesla.

*Cordova and Jabo-Cordova.* The hearing revealed that Shoudy and Chesla assisted Cordova and Jabo-Cordova. Sometime in 2008, Cordova met with Shoudy to provide information relevant to a potential fraud investigation. Shoudy's notes mention Dekelaita. Shoudy testified they were never disclosed to Dekelaita prior to trial.

Cordova applied for citizenship in 2013, but he could not establish his status as a lawful permanent resident eligible for naturalization. Following Cordova's interview with immigration officials, either Jabo-Cordova or Cordova's attorney Kejbou reached out to Shoudy about Cordova's naturalization application. Shoudy contacted the interviewing officer, provided notes from his interview with Cordova, informed the officer that Kejbou was Cordova's attorney, and stated that immigration officials were not investigating Cordova.

Agent Shoudy testified at the hearing that he provided this assistance to Cordova because his wife was cooperating in the Dekelaita investigation. At the evidentiary hearing, Shoudy admitted that the assistance provided to Cordova and communications between immigration officials about Cordova were never disclosed to Dekelaita.

Dekelaita's motions to compel likewise revealed undisclosed materials about pre-trial assistance provided to Jabo-Cordova on her I-130 application by agent Chesla. Once Cordova was naturalized in 2014, Cordova's attorney Kejbou

filed an I-130 immigrant visa petition on behalf of Jabo-Cordova. Chesla testified that he became aware of this and contacted an immigration officer, though he denied explicitly asking for the expedition and approval of the I-130. But other documents revealed that Chesla did make this request, and it was forwarded and approved because Jabo-Cordova was a key cooperator in the Dekelaita prosecution. The government disclosed that Jabo-Cordova's I-130 had been approved before Dekelaita's trial. Yet, Chesla testified at the hearing that his pre-trial request for the expedition and approval of Jabo-Cordova's I-130 was not disclosed to the defense.

*Attorney Kejbou*. Kejbou pleaded guilty to filing a fraudulent fiancé visa petition in 2005 and was required to cooperate with government investigations of immigration fraud as part of her plea agreement. Kejbou first connected Jabo-Cordova and the government after Jabo-Cordova fired Dekelaita and retained Kejbou. Hearing testimony revealed that Chesla knew before Dekelaita's trial that Kejbou had provided false information to immigration authorities regarding Jabo-Cordova's entry into the United States. Chesla admitted he admonished Kejbou before trial for her lies and warned her to refrain from submitting false asylum petitions. This admonishment was not disclosed to the defense prior to trial.

*Esho.* The evidentiary hearing also unveiled that the government failed to disclose it knew before trial that one of the client-witnesses, Raman Esho, fraudulently obtained lawful status in the United States for himself and his family. At trial, Dekelaita was aware only that Esho had asked what would happen "to him and his family immigration status" if he testified truthfully. Esho testified that that there were no issues with his family's immigration status. This was not true. Esho

testified at the § 2255 hearing that he and his wife married before coming to the United States, his wife entered the country separately on her parents' refugee visas as unmarried, and that their child was represented as her sister. Chesla's testimony provided some circumstantial evidence that the government knew of this fraud. But, Chesla never provided this information to immigration officials.

### b. Post-trial assistance

This evidence centered on the lack of government action to deport or denaturalize the client-witnesses and the availability of an "insider" to provide post-trial immigration assistance. Evidence at the hearing showed that following Dekelaita's criminal trial, the government declined to deport or denaturalize any of the client-witnesses. Nevertheless, the district court later found that no evidence "support[ed] a finding that any affirmative decision was made not to institute removal proceedings against the client-witnesses." Additionally, no evidence established that immigration agents or anyone involved in Dekelaita's prosecution had a role in that decision. To the contrary, the evidence confirmed that the decision not to pursue denaturalization was made without involvement of agencies related to the government's investigation and prosecution of Dekelaita well after Dekelaita's trial. And in the government's post-hearing brief, the government argued nothing indicated that the client-witnesses came to a pre-trial agreement or understanding with government agents that they would receive these benefits because of their cooperation. As the government reminded the court, Dekelaita knew the witnesses might be permitted to remain in the United States.

The hearing evidence also showed that the agents, Chesla in particular, provided post-trial immigration advice and assistance to some of the client-witnesses. At least ten of the client-witnesses, or someone from their family, reached out to Chesla post-trial seeking help with naturalization or green card applications. Chesla provided the requested assistance. But for their cooperation, Chesla would not have provided this aid. To the district court, Chesla acted to "further reward the client-witnesses" for their cooperation.

### 3. *The district court denies relief*

After the hearing and post-hearing briefing, the district court denied Dekelaita's § 2255 motion. In his *Napue* claim Dekelaita contended that the client-witnesses testified falsely that the government made no promises about their future immigration status. The district court rejected this claim, concluding that Dekelaita failed to show that the government had made any such promises. Similarly for Dekelaita's *Brady* claim, the court ruled that "the evidence does not support a finding that the client-witnesses … had any understanding or promise (express or tacit) *before trial* regarding any particular steps that the OIG [Office of Inspector General] agents would take on their behalf or that any particular outcome would be obtained."

While there were no promises to forestall deportation, the court found that, post-trial, agents provided "a number of the client-witnesses … advice, aid, and/or assistance." As to Jabo-Cordova in particular, the court found that Chesla took steps to facilitate her non-removal. Still, the court concluded that none of the evidence reflected any "*pretrial understanding* that Chesla or OIG would assist or condone a false application for immigration benefits." Rather, it was "much more likely that

what happened was that, after Dekelaita's trial or after his appeal, agent Chesla was willing to look the other way" given Jabo-Cordova's cooperation. The record revealed that "the client-witnesses knew they could reach out to the OIG agents for assistance after the trial," and that agents, pre-trial, "had told them as much." Though the expectation of assistance "did not include any guarantee, promise, or representation regarding any results," the court recognized the "witnesses had [] an assurance that they have an 'insider' available and willing to help them on immigration-related matters," and the government was obligated to disclose this understanding.

Crucially, however, the failure to disclose that understanding of assistance was not material. The district court found Dekelaita had "not shown that the undisclosed promise of assistance" was "reasonably likely to have made a difference in [his] trial." The court pointed to the "significant evidence entirely unrelated to the credibility of the client-witnesses" supporting the verdict, including the testimony of attorney Takhsh and the recorded conversation between Jabo-Cordova and Dekelaita. Additionally, the court noted "there was plenty of evidence that was submitted at the trial to impeach the client-witnesses," and "[t]he defense cross-examined multiple witnesses about their desire to remain in the U.S. and the fact that their ability to do so was largely in the hands of the government." The undisclosed evidence, therefore, was "to a significant extent cumulative."

Dekelaita moved to reconsider, arguing the district court failed to address pre-trial benefits received by some of the client-witnesses. The court denied the motion, referencing portions of its original order and reasoning that "[t]he contentions regarding allegedly undisclosed evidence relating to

pretrial assistance to Francisco Cordova and Rafida Jabo-Cordova were and are outside the scope of the claims in the section 2255 motion." Moreover, Dekelaita "knew the scope of the claims and more specifically knew the scope of the matters on which the Court ordered a hearing and did not seek to amend the section 2255 motion at any point."

## II. Analysis

Dekelaita faults the district court's finding that some additional evidence of government pre-trial assistance was "outside the scope" of his § 2255 motion. He also argues the district court erred because he proved that the government withheld information in violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963). So, Dekelaita asks that the denial of his motion be reversed and that his motion be granted, or alternatively that this case be remanded for more fact finding.

### A. Mootness

Before deciding the merits, we greet a threshold issue. Though Dekelaita was "in custody" at Federal Correctional Institution Terre Haute when he filed his § 2255 motion, by the time the district court denied the motion on September 22, 2022, Dekelaita's one year-term of supervised release had expired. We asked the parties to address whether this appeal is moot as a result. We agree with the parties that it is not.

The Supreme Court has explained that "[o]nce the convict's sentence has expired … some concrete and continuing injury other than the now-ended incarceration … must exist if the suit is to be maintained." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (citing *Carafas v. LaVallee*, 391 U.S. 234, 237–38 (1968)). The petitioner must point to some "collateral consequence" of his conviction. *Id.* We presume that all criminal convictions

entail adverse collateral consequences. *Id.* at 12; *Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998).

Three collateral consequences stem from Dekelaita's conviction: (1) he is prohibited from possessing a firearm under Illinois and federal law; (2) he cannot serve on a federal jury; and (3) he may be impeached in a future proceeding under the Illinois and federal rules of evidence. *See Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) (recognizing inability to possess firearms lawfully as a collateral consequence of a criminal conviction); *Carafas*, 391 U.S. at 237 (holding same for inability to serve on a jury); *Sibron v. New York*, 392 U.S. 40, 55–56 (1968) (holding same for possible future impeachment). Given these present consequences, Dekelaita's appeal is not moot, and we may turn to the merits.

### B. Merits

The crux of Dekelaita's appeal is his assertion that the government failed to disclose evidence in violation of his due process rights, impermissibly tainting his trial and conspiracy conviction. Specifically, Dekelaita argues that the government improperly withheld evidence of substantial immigration assistance provided by government agents to the client-witnesses before and after trial.

"Appeals from the denial of § 2255 relief are governed by a dual standard of review": we review factual findings for clear error and issues of law de novo. *Williams v. United States*, 879 F.3d 244, 248 (7th Cir. 2018). When a district court holds an evidentiary hearing, its factual findings and credibility determinations are entitled to "exceptional deference" on appeal. *Foster v. United States*, 735 F.3d 561, 564, 566 (7th Cir. 2013).

To assess whether the district court was correct, we apply the law controlling the government's responsibility to share information with a criminal defendant. The Fifth Amendment's due process clause mandates the prosecution disclose "evidence favorable to an accused … where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. This disclosure duty applies in the absence of a defendant's request for such evidence and includes both exculpatory and impeachment evidence. *See United States v. Agurs*, 427 U.S. 97, 107 (1976); *see also Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017). "To succeed on a *Brady* claim, a defendant bears the burden of proving that the evidence is (1) favorable, (2) suppressed, and (3) material to the defense." *United States v. Johnson*, 43 F.4th 771, 783 (7th Cir. 2022) (citations omitted). "Evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* at 784 (quoting *Turner v. United States*, 582 U.S. 313, 324 (2017)) (cleaned up).

This court has explained that, as it pertains to witness benefits, the government can violate *Brady* in three ways. *See Wisehart v. Davis*, 408 F.3d 321, 323–24 (7th Cir. 2005). First, the government fails to comply with its *Brady* obligations when it fails to disclose the benefits provided to a witness in exchange for cooperation. *Id.* at 323. The second kind of violation occurs when the government offers benefits to a witness "in the hope of making [the witness] feel [like he is] part of the state's team and as a result inclined, out of gratitude, friendship, or loyalty, to testify in support of the prosecution." *Id.* at 324. The third category is an "intermediate between the first two" and

occurs where the government gives a witness a "definite ben-efit that is neither a quid pro quo nor lavish, yet permits an inference that the witness's testimony would be affected." *Id.* Dekelaita's argument regarding the post-trial availability of an "insider" falls into this third category. This court has re-jected a fourth category where "the state merely doesn't come down as hard on a witness as it could." *Id.*

### 1. Claims as to undisclosed evidence of pre-trial bene-fits

Dekelaita claims the government failed to disclose certain evidence of pre-trial benefits. The district court found that his contentions as to these benefits "were not part of Dekelaita's section 2255 motion, and thus a claim based on these conten-tions [was] not properly before" it. Even if they were part of Dekelaita's motion, the court ruled "none of that particular allegedly undisclosed information was material." Dekelaita contests that conclusion. We decline to address the district court's conclusion that these claims were outside the scope of Dekelaita's § 2255 motion. Nevertheless, we agree that the un-disclosed information of pre-trial benefits was immaterial.

Though brief in analysis, the district court's merits conclu-sion on Dekelaita's pre-trial benefits claim was correct. Evidence of pre-trial benefits provided to Cordova, Jabo-Cor-dova, Kejbou, and Esho would not have changed the result of Dekelaita's criminal trial.[1] Start with the evidence of the pre-

---

[1] Recall that the evidence of pre-trial benefits included: (1) assistance provided to Cordova on his naturalization application; (2) assistance pro-vided to Jabo-Cordova on her I-130 application; (3) information regarding Kejbou's filing of fraudulent statements on behalf of Jabo-Cordova and

trial benefits furnished to Cordova, Jabo-Cordova, and Esho. Dekelaita points to no evidence that any of the three was aware that the government benefited them pre-trial. And without prior knowledge of the benefit, Dekelaita cannot assemble even an inference that the assistance provided to Cordova or the "looking the other way" from Esho's immigration fraud affected their testimony. *Cf. United States v. Jones*, 79 F.4th 844, 859–60 (7th Cir. 2023) (affirming district court's denial of motion for new trial premised on government's failure to disclose plan to pay cooperating witness post-trial bonus because disclosure of a benefit unknown to the witness "would [not] have changed the jury's ultimate guilt of determination").

A second problem arises for Dekelaita on the materiality of these pre-trial benefits—the key issues pertaining to them were fully aired at Dekelaita's trial. As to agent Shoudy's assistance to Cordova on his naturalization application, Dekelaita elicited discrepancies about the length of time Cordova was outside the United States and the approval of his visa. Similarly, regarding agent Chesla's request to expedite Jabo-Cordova's I-130 application, the jury was well aware that the government permitted her to remain the United States while she cooperated, even subsequent to the expiration of her deferred action status. Concerning the concealment of Kejbou's fraudulent statements on Jabo-Cordova's behalf and Chesla's admonishment, Dekelaita asserts that such evidence would have undermined the credibility of Jabo-Cordova's trial testimony. But because Dekelaita's counsel readily attacked Jabo-Cordova's credibility at trial based on her past

Chesla's admonishment; and (4) the government's disregard of Esho's immigration fraud.

frauds, the pre-trial benefit evidence Dekelaita points to is cumulative impeachment evidence. The same is true of any evidence that the government looked away from Esho's past immigration fraud. Dekelaita argues this evidence would have served to impeach Esho and the general integrity of the investigation. But Dekelaita's counsel did just at trial, highlighting the lies perpetrated by the client-witnesses to obtain asylum. Because none of this evidence of pre-trial benefits was material, the court correctly denied Dekelaita's claim as to these benefits.

### 2. *Claims as to undisclosed evidence of post-trial assistance*

Next, we consider whether the district court properly denied Dekelaita's claim of alleged *Brady* violations stemming from the government not disclosing certain evidence of post-trial benefits the client-witnesses received.

The district court made two key findings on Dekelaita's *Brady* claims: (1) the government did not pursue either deportation or denaturalization for any of the client-witnesses despite their fraud to obtain legal immigration status; and (2) a number of the client-witnesses received post-trial advice and assistance regarding their immigration status from government agents, particularly agent Chesla.

The evidence connected to these two facts, the district court concluded, did not prove that the government violated Dekelaita's rights under *Brady*. First, the court found no evidence of a pre-trial promise or agreement—contrary to Dekelaita's assertion—that a client-witness's cooperation and testimony would result in a favorable immigration outcome. Second, as to the nondisclosure of Chesla's post-trial

assistance to some of the witnesses, the district court concluded that there was no legal problem with this assistance, so long as no particular promises were made to the client-witnesses prior to trial. The evidence, the court reasoned, did not support a conclusion that the client-witnesses "had any understanding or promise (express or tacit) *before trial* regarding any particular steps that the [immigration] agents would take on their behalf or that any particular outcome would be obtained." And again, because no pre-trial understanding was shared that the client-witnesses would receive any benefit affecting their immigration status, the government was not "obligated to disclose promises that were not made."

But the evidence did show, the district court found, that the government failed to disclose one benefit: the availability of an "insider," agent Chesla, willing to assist them on any immigration issues that arose post-trial. Yet, the court concluded that no *Brady* violation occurred because the agreement was not material: there was not a reasonable probability that a different outcome would have occurred but for the government's failure to disclose. Because no *Brady* violations occurred, the district court denied Dekelaita's § 2255 motion.

The district court did not err in denying Dekelaita's § 2255 motion. No *Wisehart* violation occurred as to the nondisclosure of the government's decision not to pursue the deportation or denaturalization of the client-witnesses. As Dekelaita admits on appeal, there was no agreement that the client-witnesses would receive favorable immigration outcomes in exchange for their cooperation. "The government is free to reward witnesses for their cooperation with favorable treatment … without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the

witnesses prior to their testimony." *Wisehart*, 408 F.3d at 325 (emphasis in original) (quotation omitted). All the client-witnesses testified at Dekelaita's trial that the government made no promises regarding the resolution of their immigration status. The government only informed the client-witnesses of three possible outcomes without any assurances of which outcome they would obtain. This was disclosed to Dekelaita.

At bottom, Dekelaita wants us to recognize the rejected fourth category of benefit: by refusing to pursue deportation or denaturalization of the client-witnesses, all of whom were complicit in immigration fraud, the government did not "come down as hard" on these witnesses as it should have. *Wisehart*, 408 F.3d at 324. Missing from his argument is any evidence of an agreement on the part of the government to "go easy" on the client-witnesses. Certainly, the client-witnesses hoped—or even expected—that their cooperation would garner some leniency from the government. But this expectation is shared by most government cooperators. And expectation does not an agreement make: "what one party might expect from another does not amount to an agreement between them. … Without an agreement, no evidence was suppressed, and the [government's] conduct, not disclosing something it did not have, cannot be considered a *Brady* violation." *Id.* at 325 (quotation omitted).

Nor did the government violate *Brady* by failing to disclose the agreement between agents and the client-witnesses that they would have an "insider" available to them to render post-trial immigration assistance. As the district court concluded, this agreement should have been disclosed. At the least, the availability of an insider for post-trial immigration assistance falls into the third category of benefits that must be

disclosed—a "definite benefit that is neither a quid pro quo nor lavish, yet permits an inference that the witness's testimony would be affected." *Wisehart*, 408 F.3d at 324.

Yet, Dekelaita's due process rights were not infringed by the failure to disclose this agreement. Recall, if the government fails to make a required disclosure under *Brady*, we may conclude that a violation occurred only if the defendant can show a "reasonable probability" that the outcome of the trial would have been different had the error not occurred. *Johnson*, 43 F.4th at 784. Dekelaita cannot make that showing for two reasons.

First, evidence other than the testimony of the client-witnesses supported Dekelaita's conspiracy conviction. The discovery of undisclosed impeachment evidence usually does not warrant a new trial under *Brady*, except where the only evidence supporting the verdict is "the uncorroborated testimony of a single witness." *United States v. Salem*, 578 F.3d 682, 688 (7th Cir. 2009). Here, the government presented the jury with more than uncorroborated testimony.

The jury received two separate sets of recordings supporting the existence of a conspiracy. One was a recording of an asylum interview in which Benjamin falsely translated questions and answers to facilitate Dekelaita's fraud on behalf of client-witness Rasho. Attorney Takhsh corroborated this recording, testifying that Dekelaita continued to retain Benjamin as an interpreter after Takhsh informed him of Benjamin's actions. The trial evidence also included a recording of a conversation between Dekelaita and Jabo-Cordova in which he instructed her to acquire a baptismal certificate with false information, reminded her to stick to her story lest she "get in big trouble," and stated that he needed to feign ignorance

regarding her Ecuadorian citizenship. These recordings alone would have satisfied a conspiracy conviction.

Second, the availability of post-trial assistance from insiders amounts to cumulative impeachment evidence. Dekelaita forcefully argued at trial that the client-witnesses understood that future immigration assistance would be available. Pursuing this theory, Dekelaita's counsel cross-examined several of the client-witnesses about the possibility of remaining in the United State in hopes of shaking their reliability. Many client-witnesses admitted on cross-examination that they wanted to stay in the United States; some even confessed they expected to remain in the United States despite the lies they told to secure asylum. Counsel cross-examined Jabo-Cordova in particular about the temporary work authorization she received in exchange for her cooperation. And Dekelaita pointed out in closing that, though her deferred action expired in the middle of trial, the government had yet to remove her from the country.

The trustworthiness of the client-witnesses was fertile ground for cross-examination, and Dekelaita tilled it thoroughly. The jurors heard about the lies told by the client-witnesses to secure asylum: that they were perjurers; they committed passport and fiancé fraud; and they committed fraud both before and after working with Dekelaita. As Dekelaita's counsel argued to the jury, this was a case about "serial liars." Yet, the jury chose to credit some, if not all, of the client-witnesses. More impeachment evidence—information regarding the availability of an insider to provide post-trial immigration assistance—would not have undermined the verdict.

Dekelaita's additional arguments are unpersuasive. He challenges the district court's assessment of the trial evidence's strength. Dekelaita takes particular issue with the weight given to attorney Takhsh's testimony about interpreter Benjamin's false translations, arguing it was compromised by Takhsh's immunity deal and the fact that Takhsh hired Benjamin. But Dekelaita argued this infirmity to the jury, which was free to weigh the testimony and assess Takhsh's credibility.

Next, Dekelaita argues that "knowledge of the existence of an[] understanding that the witnesses would be given future benefits" was exculpatory because it "would have destroyed the Government's contention" that the client-witnesses' testimony hurt their chances of deportation "when, it turns out, the exact opposite was true." As the government rightfully points out, "the exact opposite was not true." As discussed above, the district court found that no promises were made to the client-witnesses regarding their immigration status in exchange for their testimony. Dekelaita does not dispute this factual finding. *See* Appellant's Brief at 41.

Finally, Dekelaita asserts the district court "applied the wrong standard for determining materiality." But the court cited the correct rule for materiality: whether the defendant has shown a reasonable likelihood that the outcome of the trial would have been different but for the error. *See Johnson*, 43 F.4th at 784; *see also Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022). And the court concluded that it "was not persuaded … that disclosure" of the understanding that an insider was available to the client-witnesses, was "reasonably likely to have made a difference in the outcome of Dekelaita's trial." The court's decision came after a lengthy hearing and after

consideration of "the cumulative effect" of the government's nondisclosure and evaluation "in the context of the entire record." *Beaman v. Freesmeyer*, 776 F.3d 500, 507 (7th Cir. 2015) (citation omitted).

In sum, the government did not violate its obligations under *Brady*. Though the government declined to pursue deportation or denaturalization for any of the client-witnesses, those two camps had no pre-trial agreement that cooperation would result in favorable immigration outcomes. And, notwithstanding the government's failure to disclose evidence of Chesla's availability to the client-witnesses for post-trial immigration assistance, that failure was not material, so it did not violate *Brady*. The district court correctly recognized all this and denied Dekelaita's *Brady* claim.

## III. Conclusion

We have benefitted here from an ample record. The district court permitted broad discovery, held an extensive evidentiary hearing, reviewed post-hearing briefing from the parties, and issued a well-considered decision. Examining those efforts, we see no error. For these reasons, we AFFIRM the denial of Dekelaita's § 2255 motion.